# Palenscar, Appellant, *v.* Michael J. Bobb, Inc.

Argued January 13, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Sidney L. Weinstein,* with him *Weinstein and Leonard,* for appellant.

*Thomas E. Byrne, Jr.,* with him *Krusen, Evans and Byrne,* for appellee.

OPINION BY MR. JUSTICE JONES, May 27, 1970:

In February of 1965, Elmer J. Palenscar instituted an action in trespass against Michael J. Bobb, Inc. (Bobb) and Best Markets, Inc., to recover damages for injuries sustained as the result of an accident which occurred on July 13, 1964. A nonjury trial in the Court of Common Pleas of Philadelphia County re-

sulted in a verdict against Bobb in the amount of $51,-000.[1] The instant appeal is from the judgment *non obstante veredicto* which was entered by a court en banc, the trial judge dissenting, upon motion by Bobb.

In July of 1964, Elmer A. Palenscar (Palenscar, Sr.) and Elmer J. Palenscar (Palenscar, Jr.) were partners in an electrical contracting business.[2] At this same time, Bobb was the lessee of a warehouse owned by Best Markets, Inc., and had called upon the firm of Elmer A. Palenscar and Son more than one hundred times over the previous eighteen months to do all of Bobb's electrical work.

On July 13, 1964, it was discovered that at least part of the warehouse electrical system was inoperative, and the Palenscar firm was contacted to locate the problem and make repairs. Palenscar, Sr., went to the warehouse and, after a brief inspection, called the Philadelphia Electric Company to have them send over a "primary man."[3] The two men checked the "primary" system, and, having found no problems there, the Philadelphia Electric Company employee left the premises.

Palenscar, Sr., next met Mr. Leno, an employee of Bobb, and told him that the entire electrical system was obsolete and dangerous. Specifically, Leno was told that the circuit breakers had been in need of re-

[1] At trial a voluntary nonsuit was granted in favor of Best Markets, Inc.

[2] The father, Palenscar, Sr., testified that he took care of any emergency repair work, but that he deferred to his son for the more difficult work: "Well, if it's over my head, you know, I call the boys in. If there's a wiring job, then they come in."

[3] The "primary" system carried 13,200 volts and any repairs thereto would have been the responsibility of Philadelphia Electric. Transformers were used to reduce this high voltage first to 550 volts and then to 110 volts, this portion of the wiring being the "secondary" system.

pair since before Bobb leased the premises. Palenscar, Sr., estimated that it would cost well over $1,000 to replace the existing system, and Leno told him that, since the building was due to be condemned at any time for the construction of the Delaware Expressway, Leno preferred not to make such an investment.[4]

In response to a call from Palenscar, Sr., William Lawler, an employee of Beeman Electric Company, brought some electrical meters to the warehouse, and the two men proceeded to check the circuitry for the east side of the building, having first cut off the power to that side. Meanwhile, Palenscar, Jr., arrived with a coil of wire his father had requested, and proceeded to check the west side of the building. However, he did not first shut off the power for that side.

During the course of his work, Palenscar, Jr., came upon one particular circuit breaker, which he believed to be the source of the problem. By this time, Palenscar, Sr., and Lawler had found everything to be satisfactory in their half of the warehouse, and had restored the power to the east side. In order to examine the circuit breaker, Palenscar, Jr., began removing the cover from the box which enclosed the breaker. Before he could finish, there was a flash of light and an explosion, as the result of which Palenscar, Jr., was severely burned, suffering the injuries for which he presently seeks recovery. The explosion was apparently caused by a short circuit in the box, a contact between two burned and disconnected wires. The wiring in the box was generally in very poor condition, most of it more than fifty years old.

The question before this Court involves the propriety of the entry by the court en banc of a judgment

---

[4] The warehouse was subsequently taken and had been demolished approximately one year before this case went to trial.

n.o.v. in favor of the defendant, Bobb. In particular, we must determine whether Bobb breached any duty which was owed to Palenscar, Jr.

The *Restatement (Second) of Torts,* §343 (1965), defines the liability of a possessor of land to an invitee, particularly with respect to "Dangerous Conditions Known to or Discoverable by Possessor," and reads as follows: "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger."

This portion of the *Restatement* has been cited numerous times by this Court as support for the proposition that "the law of Pennsylvania does not impose liability if it is reasonable for the possessor to believe that the dangerous condition would be obvious to and discovered by his invitee." *Mike v. Lebanon Miridites League,* 421 Pa. 217, 220, 218 A. 2d 814, 815 (1966). It is perfectly clear under Section 343(b), as quoted above, that Bobb would have no duty to warn an invitee, such as Palenscar, Jr., of a danger which was more obvious to and more likely to be discovered by Palenscar, Jr., than by any employee of Bobb. *Repyneck v. Tarantino,* 415 Pa. 92, 95, 202 A. 2d 105, 107 (1964). Contrary to the terms of this section of the *Restatement,* it was the expectation and the *intention* of both the possessor *and* the invitee in the case at bar that the electricians would "discover or realize the danger," and, accordingly, "protect themselves against it." That is precisely why they were hired.

The record in this case supports the statement by the court en banc that "defendant knowingly maintained a faulty and dangerous electrical system in its warehouse." Therefore, an excellent case for liability might exist if the plaintiff had been on the premises, for example, to paint the walls. *See Miller v. Hickey,* 368 Pa. 317, 81 A. 2d 910 (1951). However, the record also amply supports the finding of the court en banc that "[t]here is little doubt that plaintiff knew of the dangerous condition of the entire electrical system."

Bobb's electrical system was faulty and malfunctioning, and the plaintiff had been hired to locate and repair the fault, for which work he represented himself to be well qualified. It would be unjust to find that Bobb should have repaired the system, and yet hold the company liable to one who had been employed to do exactly that. *See Engle v. Reider,* 366 Pa. 411, 77 A. 2d 621 (1951). "[A]s an exception to the general rule requiring the owner or occupier of premises (contractee) to furnish a safe place of work to an independent contractor and the latter's employees, the owner or occupier is under no duty to protect them against risks arising from or intimately connected with defects of the premises . . . which the contractor has undertaken to repair." Annot., 31 A.L.R. 2d 1375, 1381-82 (1953). *Accord, Searles v. Boorse,* 264 Pa. 454, 107 Atl. 838 (1919).

Palenscar, Jr., did locate the defect he was employed to repair, but he failed to take proper precautions to protect himself.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

The majority of this court as well as the court en banc cite the evidence in the record that appellee know-

ingly maintained a faulty and dangerous electrical system in its warehouse. Palenscar, senior, himself told one of Bobb's principals on the date of the accident and prior to its occurrence "that the whole system was obsolete, dangerous." Nor was this the first time the dangerous condition of the electrical system had been brought to Bobb's attention. Palenscar, senior, testified: "I raised it ever since the first day we got there, the condition of that plant." There is no doubt then that Bobb maintained an electrical system known to be obsolete and dangerous. The court below also upholds the trial court's finding that appellant was not contributorily negligent.

However, the court en banc and the majority here go on to conclude that appellee breached no duty owed to the appellant because "there is no duty incumbent upon a possessor of land to warn an invitee of a danger which is at least as obvious to the invitee as it is to the possessor" (opinion below, citing *Repyneck v. Tarantino*, 415 Pa. 92, 95, 202 A. 2d 105 (1964).

The majority and the court below also cite the *Restatement of Torts 2d*, §343, to support their opinions. Section 343 provides as follows: "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger."

In considering a motion by defendant for judgment non obstante veredicto, it is hornbook law that the testimony must be viewed in the light most advantageous to the plaintiff and all reasonable inferences from and

all conflicts in the testimony must be resolved in his favor. With this in mind, it is my opinion that *Repyneck* does not apply to the instant case, and viewing the facts in the light most favorable to appellant, §343 of the *Restatement of Torts 2d* requires a conclusion opposite from that reached by the majority on the question of whether appellee owed a duty to the appellant, the breach of which was the proximate cause of the accident.

As a repairman, appellant was an invitee on the premises. *Miller v. Hickey*, 368 Pa. 317, 81 A. 2d 910 (1951). As an invitee, he was owed a higher duty than a bare licensee.

With regard to dangerous conditions on the premises, the duty of the person in possession of the premises to an invitee depends upon whether the dangerous condition is, in the language of the title to §343 of the *Restatement of Torts 2d* a "Dangerous Condition Known to or Discoverable by Possessor" or the dangerous condition is, in the language of §343(A), a "Known or Obvious Danger."

If the defect is known or obvious, then in the words of §343(A)(1): "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them unless the possessor should anticipate the harm despite such knowledge or obviousness."

The statement in *Repyneck* relied upon by the court en banc that there is no duty incumbent on a landowner to warn invitees of a danger which was at least as obvious to them as it was to him deals with situations involving a known or obvious danger. In *Repyneck* the injury was caused when a large power crane came into contact with overhead high voltage wires. In *Ambrose v. Moffat Coal Co.*, 358 Pa. 465, 58 A. 2d 20 (1948), a case cited by the opinion in *Repyneck*,

the injury was caused when the plaintiff tripped over a large stone imbedded in the roadway. In both *Repyneck* and *Moffat,* the dangerous condition was easily observable. The opinion in *Moffat* cites §340 of the *Restatement of Torts,* which dealt with "Dangerous Conditions Known to Licensees." This section has been omitted from the second edition of the *Restatement of Torts* with the explanation that the matter is now covered by 342, as to licensees, and 343(A) as to invitees.

The law of §343(A), the law quoted in *Repyneck* concerning the possessor's duty with regard to a known or obvious danger, does not apply to the instant case. Here, the danger was caused by the defective wiring inside the switchgear box. While it was obvious that the entire system was obsolete, and needed to be thoroughly examined with a view to replacing worn-out parts, it was not obvious that the wires inside the switchgear box were completely without insulation and would explode on contact. Moreover, the switchgear box was part of the 550-volt system. Appellant had never before worked on that system. He had never before seen what was underneath the cover of that switchgear box. Consequently, he could have no actual knowledge of the condition of the wiring inside that box.

Because the danger was neither known nor obvious, the duty owed by appellee to an invitee like appellant with regard to that danger was the duty outlined in §343 of the *Restatement of Torts 2d,* as quoted *supra.* Comment "d" to this section of the Restatement goes on to explain as follows: "d. *What invitee entitled to expect.* An invitee is entitled to expect that the possessor will take reasonable care to ascertain the actual condition of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and the risk involved

therein. Therefore, an invitee is not required to be on the alert to discover defects which, if he were a mere licensee, entitled to expect nothing but notice of known defects, he might be negligent in not discovering. This is of importance in determining whether the visitor is or is not guilty of contributory negligence in failing to discover a defect, as well as in determining whether the defect is one which the possessor should believe that his visitor would not discover, and as to which, therefore, he must use reasonable care to warn the visitor."

Reasonable care to protect an invitee from dangerous conditions known to or discoverable by the possessor has been interpreted by this court to require the possessor to keep the premises in reasonably safe condition, and to warn the invitee of defects known or discoverable by the exercise of reasonable care and diligence. *Miller v. Hickey, supra, Sorrentino v. Graziano,* 341 Pa. 113, 17 A. 2d 373 (1941), *Engle v. Reider,* 366 Pa. 411, 77 A. 2d 621 (1951), *Newingham v. J. C. Blair Co.,* 232 Pa. 511, 81 Atl. 556 (1911). The fact finder found that appellee knew that its system was obsolete and should be replaced. If appellee had had its entire electrical system inspected, as a reasonable possessor would have done, the defective wiring inside the switchgear box would have been discovered. Rather than pay someone to examine the entire system and replace all badly worn components, or at least identify them, appellee chose to make do with its obsolete system because of the impending condemnation of the building. This was unreasonable and a breach of a duty owed to appellant.

The majority appears to adopt the rule that "An employee cannot recover for injuries received while doing an act to eliminate the cause of the injury," stated in *Kowalsky v. Conreco Company,* 264 N.Y. 125, 190 N.E.

206.   I do not believe that such a rule has any applicability to the instant case.  The appellant was not on the premises to eliminate all of the dangerous conditions in appellee's electrical system.  As the record shows, rather than have its system thoroughly overhauled, appellee had chosen to make do with patchwork repairs.  The appellant was on the premises merely for the purpose of determining the cause of the power failure and making those repairs.  As stated in appellee's brief, "For all that the Bobb personnel knew of the matter, their lights might have been out because a fuse had blown."  There is no indication that the defective wiring in the switchgear box which had caused the explosion and the injury was also the cause of the power failure which compelled appellee's original call for appellant's father to come to the premises.

If the appellant had been called by appellee to make a complete examination of its entire obsolete system with a view to replacing or repairing all worn out parts, I would consider the rule of *Kowalsky*; however, I do not believe we have that situation here.

I would reverse and enter judgment on the verdict of the trial judge.

Mr. Justice ROBERTS joins in this dissent.