James MAGILL, Administrator of the Estate of Frank W. Magill, Jr., Deceased

v.

WESTINGHOUSE ELECTRIC CORPORATION

v.

MURPHY, INC.

Civ. A. No. 43043.

United States District Court, E. D. Pennsylvania.

June 4, 1971.

Carl M. Mazzocone, Philadephia, Pa., for plaintiff.

F. Hastings Griffin, Jr., Philadelphia, Pa., for Westinghouse.

Mark D. Alspach, Philadelphia, Pa., for Murphy.

## OPINION

LUONGO, District Judge.

On January 27, 1967, Francis W. Magill was fatally injured while painting machinery in the Westinghouse Electric Corporation (Westinghouse) plant at Lester, Pennsylvania. Magill was an employee of Murphy, Inc. (Murphy), a painting contractor, which had been engaged by Westinghouse to paint the machinery.

The administrator of Magill's estate instituted this suit against Westinghouse

under the Pennsylvania Survival and Wrongful Death Acts. 20 P.S. § 320.601; 12 P.S. §§ 1601–04. Westinghouse filed a third-party complaint against Murphy for indemnity pursuant to the terms of an agreement between them.

The case was tried to a jury and submitted to it on interrogatories in accordance with Rule 49(a), F.R.Civ.P. By its answers,[1] the jury found that Westinghouse was negligent, that its negligence was the cause of the accident, that decedent was not contributorily negligent, that Murphy was not negligent, and assessed damages under the Survival Act at $171,270 and under the Wrongful Death Act at $29,000. Accordingly, verdict and judgment were entered for the administrator and against Westinghouse in the principal action, and in favor of Murphy and against Westinghouse in the third-party action.

Before the court are Westinghouse's motions for judgment n. o. v., or, in the alternative, for a new trial in both the principal and the third-party actions. Westinghouse has advanced several grounds for its motions.

*The Facts.*

Viewing the evidence in the light most favorable to the prevailing parties, i. e., Magill's administrator and Murphy [Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 130 A.2d 123 (1957)], the jury could have reasonably found these facts:

Murphy was engaged by Westinghouse to paint machinery and equipment located in "H" Building of Westinghouse's plant in Lester, Pennsylvania. "H" Building is approximately 135 yards long and 50 yards wide. The machines were located along three main aisles running the length of the building. The machines to be painted were designated by the Westinghouse foreman, but in general the machines were painted in order, one after another, along an aisle. The machines were many and varied and were highly dangerous to those not familiar with them. There were a variety of power controls for the machines. Some controls were located on the machines, others were on nearby columns; some controlled one machine while others controlled several. In addition to the main power controls to the various machines, there were operating controls, some of which were spring loaded buttons for "stop," "reverse" and "forward" motions. One could not tell by their appearance which operating control button had been activated.

Work under the agreement between Murphy and Westinghouse commenced around January 3, 1967. The regular painting crew consisted of a foreman (William Crouthamel), two journeymen painters (Frank Drozdowski and the decedent), and an apprentice (Frank Costello).[2] Although the painting was to

---

1. The interrogatories and answers read as follows:

"1. Was Westinghouse Electric Corporation negligent?

Yes x No ____

2. If your answer to Interrogatory #1 is YES, was Westinghouse's negligence a substantial factor in causing the accident in which Frank Magill was killed?

Yes x No ____

3. Was Frank Magill guilty of contributory negligence, i. e. was he guilty of negligence which contributed, in any degree, to the happening of the accident in which he was killed?

Yes ____ No x

If you have answered "YES" to Interrogatories #1 and #2, and if you

have answered "NO" to Interrogatory #3, answer the following Interrogatories:

"4. In what amount do you assess damages:

(a) Under the Wrongful
 Death Act $ 29,000.00
(b) Under the Survival
 Act $171,270.00
Total Award $200,270.00

5. Was Murphy, Inc. guilty of negligence which contributed, in any degree, to the happening of the accident in which Frank Magill was killed?

Yes ____ No X "

2. On the night of the accident, decedent's brother, Robert G. Magill, was also working with the crew.

have been done on Westinghouse's third shift (midnight to 8:00 a. m.), each evening Murphy's men arrived and were admitted to the plant around 11:00 p. m. and began work about 11:15 p. m. with the approval of Westinghouse.

On the evening prior to the accident, Crouthamel was instructed by the Westinghouse foreman to paint the next machine in line, a lathe operated by one Frank Fiego. Fiego knew that his machine was going to be painted that night although he had not been officially informed of the fact by his foreman.

On the night in question, when the painters reached his lathe Fiego had stopped working and had secured his tools. He said to the painters "It's all yours" and went to the washroom without turning off the power to his machine. The painting crew began to clean the machine in preparation for painting it. In the process of brushing steel filings from the machine, decedent leaned into the ways of the lathe. His leg apparently struck the clutch handle, setting the machine in motion, the lathe began to turn, and the protruding jaws of the chuck struck decedent about the head and shoulders, causing his death.

*The Motions.*

For the sake of clarity I will treat the motions in each action separately, although Westinghouse assigns some of the alleged errors as prejudicial in both actions.

## JAMES MAGILL, ADMINISTRATOR v. WESTINGHOUSE ELECTRIC CORPORATION

### 1. *Motion for Judgment N. O. V.*

■ An employee of an independent contractor working on premises owned by another is a business invitee. Mathis v. Lukens Steel Co., 415 Pa. 262, 203 A.2d 482 (1964). The possessor of land owes to the contractor's employee, as a business invitee, a "duty of reasonable care to make its premises safe for him and to give him adequate warning of any dangers known to [the possessor] and unknown to" the employee. Mathis v. Lu-

kens Steel Co., *supra*, at 264, 203 A.2d at 484; Argo v. Goodstein, 438 Pa. 468, 265 A.2d 783 (1970); Stringert v. Lastik Prods. Co., 397 Pa. 503, 155 A.2d 625 (1959); Stark v. Lehigh Foundries, Inc., *supra*. The duty of care extends not only to the premises themselves but to the activities of the possessor or his employees which may affect the conditions of the premises. Argo v. Goodstein, *supra*. A possessor's duty is satisfied if it is reasonable to believe that the dangerous condition would be obvious to and discovered by an invitee. Mike v. Lebanon Miridites League, 421 Pa. 217, 218 A.2d 814 (1966).

In the instant case, decedent was a business invitee, and as such, Westinghouse owed him the duty to exercise reasonable care to provide a safe place to work, or to give him adequate warning of unknown dangers.

Westinghouse argues that it is entitled to judgment notwithstanding the verdict because (a) the painters were aware that the machines were dangerous and the dangerous condition was obvious, and (b) that its duty as a possessor of land was satisfied when it warned Murphy that it (Murphy) should check to see that the machines were turned off before permitting its employees to begin painting.

■ (a) As for Westinghouse's contention that the painters were aware that the machines were dangerous and the dangerous condition was obvious, this was true so long as they knew that the machines had current running into them, but there was evidence from which the jury could have found that Murphy's employees had been led to believe by Westinghouse personnel that the power to Fiego's lathe had been turned off, and that consequently the dangerous condition had been eliminated. The evidence tending to support such a finding is that Westinghouse's foreman had given instructions that Fiego's lathe was to be painted that night; Fiego told the painters "It's all yours" after all his gear had been secured, and Fiego left his machine at a

time when the painters were standing by, waiting to start work. That evidence afforded ample support for the jury's conclusion that Murphy's men had taken adequate steps to assure themselves that the machine was inoperable and presented no danger to them. Stark v. Lehigh Foundries, Inc., *supra*.

■ (b) Westinghouse's second contention, that it had discharged its obligation to warn the painters by warning the contractor, also lacks merit. Even assuming that Westinghouse had warned the contractor that these machines were dangerous and that the contractor should check to make sure that the power to a machine was cut off before commencing to paint it (testimony which the jury was free to disregard), the question remains whether such warning was adequate under the circumstances. The cases upon which Westinghouse relies [Palenscar v. Michael J. Bobb, Inc., 439 Pa. 101, 266 A.2d 478 (1970); Janowicz v. Crucible Steel Co., 433 Pa. 304, 249 A.2d 773 (1969); Grace v. Henry Disston & Sons, Inc., 369 Pa. 265, 85 A.2d 118 (1952); Engle v. Reider, 366 Pa. 411, 77 A.2d 621 (1951), overruled in part, Mathis v. Lukens Steel Co., *supra*; Valles v. Peoples-Pittsburgh Trust Co., 339 Pa. 33, 13 A.2d 19 (1940); Celender v. Allegheny County Sanitary Authority, 208 Pa.Super. 390, 222 A.2d 461 (1966)] for its assertion that a general warning regarding dangerous conditions relieves a possessor of land of liability are inapposite.

*Grace, Engle* and *Valles,* are all cases in which the contractor was in exclusive control of the premises or the repair operation. The rationale appears to be that under such circumstances the possessor of land has neither the authority nor the ability to control the conduct of the contractor's employees or the premises. The Pennsylvania Supreme Court has consistently indicated that the holdings of these decisions should be limited to exclusive control situations. See, e. g., Mathis v. Lukens Steel Co., *supra;* Cooper v. Heintz Mfg. Co., 385 Pa. 296, 122 A.2d 699 (1956). *Celender* and *Pal-*

*enscar* hold only that an employee of a contractor cannot recover from the possessor of land for injuries sustained as a result of the very defects which the contractor had undertaken to repair, and as to which, presumably, the contractor was the more knowledgeable. Finally in *Janowicz,* the court merely stated that the rule in *Grace* was inapplicable because no warning had been given to the contractor.

In the instant case, Westinghouse, not Murphy, was in control of the premises. It continued to conduct its operations on a very large number of machines while the Murphy men were working on a handful. Moreover, it is clear that neither the painting contractor nor its employees were expert in sources of, or controls for, power to the machines. As noted above, Westinghouse had a great variety of machines with many different types of controls. The controls were so complex that not even Westinghouse employees were familiar with them. There was evidence that the painters had, on earlier occasions, been warned by Westinghouse not to touch the control switches since, on at least one occasion, the painters had mistakenly cut off the power to several machines which were not scheduled to be painted, and on other occasions the painters had started to paint machines which still had electrical power in them and as a result had caused several small electrical fires.

The jury could reasonably have concluded from all this evidence that Westinghouse did not take reasonable steps to warn Murphy's employees of a dangerous condition (i. e. that the power to Fiego's lathe was still on); and/or that Westinghouse did not take reasonable steps to insure that the lathe had been rendered inoperable before permitting the painters to work in and around it; and/or that Westinghouse's employee, Fiego, had lulled the painters into the belief that the lathe had been made ready for them. See Stark v. Lehigh Foundries, Inc., *supra;* Cooper v. Heintz Mfg. Co., *supra;* Debenjak v. Parkway Oil

Co., 159 Pa.Super. 603, 49 A.2d 521 (1946).

The motion for judgment notwithstanding the verdict will be denied.

### 2. *Motion for New Trial.*

In its brief in support of the motion for new trial, Westinghouse stated (page 9) "Various fundamental errors contributed to a failure to give Westinghouse substantial justice. We single out three but do not abandon the others (see footnote, *infra*)." A careful reading and re-reading of the brief fails to disclose any "footnote, *infra*" setting forth "various fundamental errors," consequently I will deal only with the ones which Westinghouse has discussed in its brief.

### A. *Opinion Evidence.*

Plaintiff presented testimony of a safety expert, Edward B. Landry, who was asked on direct examination:

"[Q]. Now, Mr. Landry, do you have an opinion, based upon reasonable certitude, as to what were the usual and customary safeguards which should have been applied in this type of situation to protect outsiders coming in on the premises?" (N.T. pp. 219–20)

Landry answered that he had an opinion, and stated as his opinion that customary safety practices required that Westinghouse safety personnel should have established a procedure placing upon one of Westinghouse's supervisory personnel the responsibility of insuring that a machine to be painted was inoperable or otherwise rendered harmless. Landry explained in some detail the procedures which should have been followed and also the various methods of rendering the lathe harmless.

Defendant asserts that this testimony "reversed" Pennsylvania law in that it imposed upon a possessor of land the duty to correct a danger, rather than simply to warn about it. Defendant complains that such testimony improperly permitted the expert and the jury to pass judgment on the law.

The court's disagreement with defendant's view of the law has already been set forth in the discussion on the motion for judgment n. o. v., and it will not be repeated here. The expert was permitted to testify as to customary safety procedures and the matter was submitted to the jury as a question of fact. It is proper to present testimony as to customary safety practices and procedures, so long as the ultimate determination as to whether defendant's conduct was negligent is left to the jury. See King v. Darlington Brick & Mining Co., 284 Pa. 277, 131 A. 241 (1925); 1 Henry, Pennsylvania Evidence, § 572, p. 589. The court's instructions clearly submitted this as a factual matter for the jury's determination. (See Charge, N.T. 509–512).

Defendant also asserts that the opinion expressed by Landry was inadmissible because the hypothetical question contained an erroneous assumption, i. e., that the painters had received no instructions with regard to turning off the electric current.

Under Pennsylvania law, "[an] expert cannot express a conclusion based on facts not in evidence * * * [or] not warranted by the evidence." 1 Henry, Pennsylvania Evidence, § 562, p. 566. It is, however, quite proper to base a hypothetical question on facts the party offering the testimony may reasonably deem established by the testimony of his own witnesses. *Id.* There was testimony in plaintiff's case that the painter employees had received no direct written or oral instructions from Westinghouse personnel as to the proper methods for shutting off the power to the various machines. In light of that testimony, it was proper to incorporate that assumption in the hypothetical question to the expert witness and for him to express his opinion thereon.

### B. *Court's Instructions as to Westinghouse's Duty to Warn.*

Westinghouse also argues that the court improperly left it up to the jury to decide what duty a possessor of

land owes to an employee of a contractor, instead of charging that the possessor owes no duty to such an employee with respect to a dangerous condition which is known to the contractor. Like the preceding argument, this contention is premised on the erroneous assumption that under Pennsylvania law a possessor is relieved of liability to an employee of a contractor merely by giving the contractor a general warning of a dangerous condition.

I instructed the jury that Westinghouse, as a possessor of land, owed a duty to employees of a contractor to keep the premises in a reasonably safe condition or adequately warn them of non-obvious dangers. I then instructed them that in deciding this question they were to determine whether warnings were given to either Murphy or its employees, and whether the warnings, if any, were adequate in light of the degree of danger involved, the customary safety practices, the lack of expertise on the part of the painters, the complexities of these machines, and other relevant factors. As has already been indicated, these instructions are in accord with applicable Pennsylvania law. See Mathis v. Lukens Steel Co., *supra;* Stringert v. Lastik Prods. Co., *supra*; Stark v. Lehigh Foundries, Inc., *supra*.

### C. *Earnings Increase Factor.*

The next ground advanced for a new trial is that the court erred in permitting an actuary to testify regarding an "earnings increase factor" in giving present worth values for future losses.

The plaintiff presented evidence through Murphy's payroll clerk that decedent's earnings for the full year prior to his death was $8,075.24, and for the month of January, 1967, was $687.00; that his earnings were based on an hourly union wage rate of $4.37 per hour; that the hourly rate had increased in 1968 to $4.66½ per hour, in 1969 to $4.91½ per hour and in 1970 to $5.21½ per hour, or a 19% increase in approximately four years.

Plaintiff then presented an actuary, Mr. Leonard Goodfarb, who testified as to decedent's life and work expectancy. He gave to the jury the amounts of money required to be invested to produce one dollar a year for different periods of time, reduced to present worth at 6% as required by Pennsylvania law. See Brodie v. Philadelphia Transp. Co., 415 Pa. 296, 203 A.2d 657 (1964). Mr. Goodfarb then gave present worth figures giving effect to an earnings increase factor, which as explained by Mr. Goodfarb, is

"a factor used by actuaries in their evaluation of pension programs where the pension to be paid the employee is based on his earnings for the last five or ten years of employment. Since that period may be many years hence, we have the problem of estimating future earnings in order to arrive at the cost of pensions, and we therefore have an earnings increase factor as part of our work." (N.T. 263).

Goodfarb testified that an earnings increase factor of 3½% per year was used by his office and that this factor was based on an assumption that average earnings of employees will continue to increase at that rate.

The jury was instructed to determine what they believed was the earning capacity of decedent in the future, including any possible increase or decrease in earnings. The jury was specifically charged that it was up to them to accept or reject the earnings increase factor as testified to by the actuary. It was explained to the jury that by accepting and applying that factor they would be deciding that decedent's earnings would be increasing at the average rate of 3½% over the next 20 or 30 years.

Westinghouse argues that permitting testimony as to an increase earnings factor was error because it effects a reduction of the 6% rate at which future losses are required to be reduced to present worth under Pennsylvania law. Counsel obviously misconceives the thrust of the testimony as to "earnings

increase factor." It is simply an attempt to project, at a certain rate, future increases in wages. Under Pennsylvania law a jury may properly consider the possibility of increases and decreases in a plaintiff's wages in computing damages for future losses. See Brodie v. Philadelphia Transp. Co., *supra*. As pointed out above, there was testimony that painters' wages had risen some 19% from 1967 to the date of trial, a rate higher than 3½% per year. Goodfarb's testimony projects that earnings will continue to rise at the rate of 3½% per year and he gave the jury figures as to the amounts of money required to be invested today *at 6%* to produce the increasing wage losses over the period of years. The effect of such testimony is to take some of the conjecture out of the jury's consideration and calculation of possible future wage increases by translating average increases of earnings into a mathematical formula. I find nothing in Pennsylvania law to prohibit such testimony. It certainly does not in any way violate the Pennsylvania requirement to reduce future losses to present worth at the rate of 6%.

What is open to question is that such testimony assumes a fairly constant rate of increase, reflecting a continuing inflationary spiral. There are different points of view on this subject and some courts have, therefore, disapproved such projections, at least as they are intended to reflect a continuing decline in the value of the dollar. See, e. g., Sleeman v. Chesapeake and Ohio Ry. Co., 414 F.2d 305 (6th Cir. 1969). The testimony here was not in terms of purchasing power, as such, it was offered solely in terms of continuing increases of wage rates, although concededly the one has an effect upon the other. In any event, in my view, there is ample basis in the experiences of the recent past for jurors to conclude that the upward trend will continue for the foreseeable future. Rather than permit them to speculate as to how to make proper allowances in their computation of future losses, it seems preferable to permit an expert (the actuary) to give them guidance. See Haddigan, Admr. v. Harkins et al., 441 F.2d 844 (3d Cir. 1970). The court's only concern with this testimony is whether there was sufficient basis for using 3½% as the rate of increase. Goodfarb's only testimony in this regard was that actuaries universally apply rates between 3% and 4% in projecting figures for funding of pension plans. His firm uses the figure of 3½% as midway between the two extremes. This furnishes some foundation, but is it enough? The answer is not at all clear and perhaps one should be forthcoming from the appellate courts. Until there is such appellate court guidance, however, I am not persuaded that the testimony was improper and will not order a new trial on this ground.

D. *Miscellaneous Points.*

In its brief, defendant has collaterally touched upon other matters as grounds for new trial. They merit little discussion.

(a) There is a contention that the verdict was against the weight of the evidence. Discussions of other contentions in other parts of this opinion reveal substantial factual support for the jury's finding that Westinghouse was negligent and that the decedent and Murphy were not negligent.

(b) There is also an assertion that the jury's verdict under the Survival Act was excessive. The award was large but it was not excessive and the separate awards under the Survival Act and the Wrongful Death Act were clearly not duplicated. Ferne v. Chadderton, 363 Pa. 191, 69 A.2d 104 (1949); *cf.* Johnson v. Baltimore & Ohio R. Co., 106 F.Supp. 166 (W.D.Pa.1952), appeal dismissed, 202 F.2d 149 (3d Cir. 1953). It does appear that the jury may have mistakenly reversed the Survival and the Wrongful Death awards, but plaintiff is not complaining about the allocation and since, in my view, the total amount awarded is reasonable, defendant has no cause to complain. The misallocation, if

it was such, affords no basis for a new trial.

(c) In the course of direct examination of one of defendant's witnesses (Murphy's foreman, William Crouthamel), the following question was asked and answer given (N.T. 394):

"Q. When you last saw Frank Magill prior to his accident, what was he doing?

A. Well, I asked him if it was O. K. I said, 'Maybe we ought to wait a while,' and he says, 'No, the operator says, "It's all yours. Go ahead." ' I said 'Where is he?' And he said, 'He went to change clothes.' "

 After the answer was completed, defendant's counsel moved to strike certain portions of the answer as hearsay. The motion was denied. It would have served little purpose at that point to strike the answer and to instruct the jury to disregard it since other witnesses had already testified that the operator, Fiego, had made the statement. The statement was not prejudicial, and does not entitle Westinghouse to a new trial.

Defendant's motion for new trial will be denied.

## WESTINGHOUSE v. MURPHY, INC.

### 1. *Motion for Judgment N. O. V.*

Westinghouse instituted the third-party action against Murphy alleging that Murphy was obligated by contract to indemnify Westinghouse for all losses sustained by Westinghouse in the suit instituted by the administrator. In relevant part, the indemnity clause upon which Westinghouse relies is as follows:

"The Contractor [Murphy] shall indemnify and save Westinghouse harmless (1) from and against all direct or indirect loss of property * * * occurring in or in connection with the performance of this contract and (2) from and against any and all claims, suits, actions, liabilities, damages, or losses whatsoever (including expenses incidental thereto) for or on account of personal injury or death or property damage (other than such injury, death, or damage as shall have been caused solely by the negligence of Westinghouse, its officers, agents, or employees) occurring in or in connection with the performance of this order or contract and sustained by any person whomsoever, including, without limitation, the Contractor, any employee of the Contractor, any employee of Westinghouse, or any other person."

The following interrogatory was submitted to the jury:

"Was Murphy, Inc. guilty of negligence which contributed, in any degree, to the happening of the accident in which Frank Magill was killed?"

The jury's answer was "No." Accordingly, verdict and judgment was entered for Murphy and against Westinghouse in the third-party action.

 The indemnity clause clearly provides that indemnification is required for all losses for personal injury or death occurring in connection with performance of the contract unless negligence on the part of Westinghouse is the sole cause of the accident. Under Pennsylvania law, such a provision means that indemnity is due whenever the contractor's negligence *or breach of contract* causes the accident. See Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907).

In support of its motion for judgment notwithstanding the verdict, Westinghouse argues that (1) its negligence could not have been the sole cause of the accident because Murphy was obligated by contract, and had breached that contractual obligation, to see to it that the power was cut off to the machines which were to be painted; (2) both the interrogatory and the court's charge were erroneous because they failed to make clear that Westinghouse would be entitled to indemnity if Murphy had breached its contract with Westinghouse and if such breach had contributed to the accident; and (3) the interrogatory did not determine that Westinghouse's negligence was the *sole* cause of the accident.

The three points are intertwined and will be considered collectively since they all revolve around Westinghouse's claim that Murphy was guilty of a breach of contract which contributed to the accident, and consequently Westinghouse's negligence could not have been the *sole* cause of the accident.

The written contract consisted of the indemnity agreement (Exh. D–1), Murphy's bid letter dated December 16, 1966 (Exh. D–2), Westinghouse's work order (Exh. D–3), Murphy's acknowledgement of the work order (Exh. D–4), and an appendix entitled "Security" (Exh. 3–D–1).[3]

Murphy's bid letter provides, inter alia:

"[Murphy agrees] to furnish all labor, material, equipment and supervision required to properly prepare and re-paint all machine tools, work benches, tool lockers, etc. in the above building on a Time-Material basis * * *."

Westinghouse contends that the written agreement contains no definition of "supervision," consequently it was entitled to present oral testimony that what the parties intended by "supervision" included that Murphy was to see to it that the power to the machines had been cut off before commencing work.[4]

■ Absent an allegation of fraud, accident or mistake, parole evidence is admissible to add to, or change, the plain meaning of the terms of a written contract only if there is an ambiguity in the meaning of certain words, or if there has been subsequent oral modifications of the terms. See United Refining Co. v. Jenkins, 410 Pa. 126, 189 A.2d 574 (1963); Easton v. Washington County Ins. Co., 391 Pa. 28, 137 A.2d 332 (1957); Better-

man v. American Stores Co., 367 Pa. 193, 80 A.2d 66, cert. denied, 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951); Atlantic Refining Co. v. Wyoming Nat. Bank, 356 Pa. 226, 51 A.2d 719 (1947).

■ Whether a particular word or phrase in a contract is ambiguous is a matter for interpretation by the court, but what the parties intended by the ambiguous language is an issue for the jury. Easton v. Washington County Ins. Co., *supra;* Waldman v. Shoemaker, 367 Pa. 587, 80 A.2d 776 (1951).

The words of a contract are to be construed according to their plain, ordinary and popular meaning unless used in a technical or trade sense. See Electric Reduction Co. v. Colonial Steel Co., 276 Pa. 181, 120 A. 116 (1923); Byrne v. Bushkoff, 177 Pa.Super. 101, 110 A.2d 813 (1955); Restatement, Contracts § 235.

■ Applying the above principles, there was no indication that the word "supervision" had a technical or particular meaning in the trade. The ordinary and popular meaning of the word is to direct the activities of others. As used in the bid letter, it is clear to me that Murphy agreed to direct the activities of its painters in the work Murphy was hired to do, i. e. the painting of machines and equipment, not the handling of controls for the power to the machines. As a matter of interpretation of the written agreement, Westinghouse did not establish that Murphy undertook by contract to insure that the power to the machines had been shut off before permitting its men to work on them. I see no ambiguity in the term "supervision."

■ It may be that Westinghouse is contending that it was entitled to present the proffered testimony as a subsequent

3. The appendix was produced by an officer of the third-party defendant who was unable, however, to identify this particular "Security" appendix as the one applicable to the job in question. Since the appendix deals with security (unauthorized personnel on the premises, etc.) rather than safety, I have considered the appendix as not particularly pertinent to this suit and I have as-

sumed, for the purposes of Westinghouse's motions, that it has presented the complete written contract.

4. Westinghouse was permitted to elicit such testimony in plaintiff's suit against it for the purpose of determining whether Westinghouse had exercised reasonable care for decedent's safety.

oral modification of the terms of the written agreement. Whether or not a subsequent oral modification of a written agreement has been made is a matter of intention and is an issue for the jury. Kirk v. Brentwood Manor Homes, Inc., 191 Pa.Super. 488, 159 A.2d 48 (1960). It is exclusively for the jury to determine whether an oral understanding has been entered into, and the meaning and understanding of the parties as to the terms of the oral agreement. McCormack v. Jermyn, 351 Pa. 161, 40 A.2d 477 (1945).

Despite the fact that Pennsylvania law on this score is clear, counsel at no point requested submission *to the jury* of any issue relating to oral understanding of the parties. There was no request for submission of an interrogatory under Rule 49(a), nor was there any request for instructions to the jury on issues relating to oral agreements. (See Westinghouse's "Points for Charge," Document #73). Westinghouse acted throughout the trial as if these were matters for the court to determine. Its failure to request submission of these issues waived its right to have them tried by a jury. Rule 49(a), F.R.C.P. See Dunn v. Ove Skou Rederi A/S, 45 F.R.D. 18 (E.D.Pa.1968).

*To summarize:*

From the court's interpretation of the written contract, Murphy did not undertake, by contract, to insure that the power to the machines was shut off before permitting its men to work on them, consequently there was no breach of the contract.

 As to breach of any alleged oral modifications of the written agreement, or as to oral understandings relating to alleged ambiguities in the written agreement, in the absence of request for the submission of such issues to the jury, Westinghouse has waived its right to trial by jury thereon. After the passage of ten days following the judgment, the issues themselves were waived in the absence of a request for the court to make a finding. (See Rule 52(b))

In the absence of any breach of the written contract, and in the absence of a request for submission of any issues as to oral agreements, there remained as the only possible basis for indemnity, the question whether Murphy had been guilty of negligence which contributed in any degree to the accident. This is precisely what was submitted to the jury in interrogatory No. 5.

Westinghouse's motion, as third-party plaintiff, for judgment n. o. v. in its favor in the third-party action will be denied.

2. *Motion for New Trial.*

Westinghouse has set forth a number of errors which it claims entitles it to a new trial in the third-party action. Some have already been discussed in connection with Westinghouse's motion for new trial in the principal action. They will not be treated again here.

Points not earlier discussed are:

 (a) The court erred in denying Westinghouse permission to introduce evidence relating to Murphy's insurance coverage after the court permitted Murphy to argue to the jury the end result of the indemnification agreement, i. e., that Murphy would be liable to Westinghouse if the jury found that Murphy was negligent.

Westinghouse argues that the normal rule prohibiting such evidence is not applicable here, because insurance coverage is a pertinent part of the contract. Counsel cites Westinghouse Electric Co. v. Murphy, Inc., 425 Pa. 166, 228 A.2d 656 (1967) in support of this proposition. The case simply does not stand for the proposition for which it has been cited. The case holds only that a clause under which a party agrees to indemnify against loss caused by an indemnitee's negligence is not void as against public policy. The rationale of the decision is that such contractual agreements may be a valid allocation of risks between the parties for the purpose of obtaining proper insurance coverage. The holding

does not intimate that the fact of insurance coverage is a proper matter for the jury's consideration.

It was proper for Murphy's counsel to point out to the jury what the effect of their answers to certain of the interrogatories would be as between Westinghouse and Murphy. That was the heart of the third-party action and the jury was entitled to be informed of the context in which it was being asked to find whether Murphy had been guilty of any negligence which contributed in any degree to Magill's death. (See Rule 49, F.R.C.P.) Such issues are present in all negligence cases, but the fact that they are has never been regarded as proper ground for revealing to the jury that the person sued is covered by insurance.

(b) The court erred in failing to correct Murphy's counsel's "patently erroneous argument" to the jury that the jury in fairness and good conscience should not find Murphy liable. There was no objection to the argument when it was made, consequently there was no opportunity for the court to rule on the propriety of the argument. In any event, the court's charge made it abundantly clear that the jury was to decide the case on the evidence and on the law as given by the court.

(c) The final argument posited by Westinghouse is that "the charge was fundamentally erroneous, amounting to no charge at all. Failure to relate the application of the law to the possible factual situations is fundamental error requiring reversal. McNello v. John B. Kelly, Inc., 283 F.2d 96 (3d Cir. 1960); Brumberger v. Burke, 56 F.2d 54 (3d Cir. 1932); Fair v. Floyd, 75 F.2d 920 (3d Cir. 1935)." (P. 22, Westinghouse's Brief)

Westinghouse has made no effort to set forth in what respects there was a failure to relate the principles of law to the possible factual situations. Without such elucidation from counsel (either at the time the charge was delivered, or in the brief on the motion for new trial), the court is unable to discern wherein the charge was "fundamentally" deficient in this respect. The motion for new trial as to Murphy will be denied.