**John F. MARSHALL and Susan M. Marshall, h/w**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.**

**Civ. A. No. 82–5288.**

United States District Court,
E.D. Pennsylvania.

May 7, 1984.

Barbara G. Scarlata, Media, Pa., for plaintiffs.

Russell Guttshall, Pittsburgh, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This is a tort action in diversity. A jury trial commenced on December 5, 1983, but at the conclusion of plaintiffs' case the following day the court granted defendants' motion for a directed verdict. Presently before the court is plaintiffs' motion for a new trial. As explained below the motion will be denied.

Plaintiffs, John and Susan Marshall, filed the present negligence suit against the City of Philadelphia and Southeastern Pennsylvania Transportation Authority ("SEPTA"), for injuries sustained by John Marshall (hereinafter "plaintiff"), on July 21, 1982, while he was working at the SEPTA train depot located at 11th and Nedro Streets in Philadelphia. This depot is owned by the City and used by SEPTA. At the time of his accident, plaintiff was an employee of United States Steel Corporation ("U.S. Steel"), an independent contractor hired by the City to replace certain fences on selected City properties. Plaintiff, a fence installer with several years' experience, had been assigned by U.S. Steel to do some of this work.

On the day of the accident, plaintiff, a co-worker, Don Diamond, and their foreman, Benjamin Vermillion, undertook the task of removing four 800 pound cast iron gate sections that formed the halves of two swinging gates located over a roadway. The gates, which were located on a hill, were mounted on posts that were embedded in the ground. What the best method for removal would be had been the subject of a discussion among the crew the previous day. Present at this discussion, along with Vermillion, Diamond and plaintiff, was Tony Ricciardi, an inspector employed by the City of Philadelphia who worked on location to ensure that U.S. Steel completed the work as specified by the City. A general consensus was reached among the group that heavy equipment, possibly a forklift, would be needed to move the gates. Plaintiff believes it may have been Vermillion who first suggested the forklift.

In any event, on the morning of July 21, 1982, a forklift was not immediately available. Vermillion decided to proceed without the forklift by using in its stead the pickup truck that he had driven to the depot that day. Affixed to the rear of this truck was a frame or rack made out of pipe. Under Vermillion's direction, the gates were removed one by one by backing the truck up flat against the individual gate and then attaching the gate to the rear of the truck with three cable devices. These devices had ratchet pulleys which could be worked to create and maintain the tension necessary to hold the gate firmly against the truck. Two of these devices, referred to as come-a-longs, were used to secure the bottom corners of the outer edge of the gate to each side of the pick-up truck. The third device was to be attached somewhere near the middle of the top portion of the gate and this was secured to the truck's pipe rack. Once the gate was secured, it was knocked loose from its post by a sledgehammer, and then the truck would drag it a short distance away for later disposal.

Vermillion, Diamond, and plaintiff removed two of the gate sections without incident using this process. While the third section was being removed, however, two of the come-a-longs snapped. One of the come-a-longs was able to be repaired, the other was not. As a result, there were only two come-a-longs available for use in removing the fourth gate. Despite this reduction in equipment Vermillion decided to go forward with the job. He directed the men to attach the two remaining come-a-longs to each of the bottom sides of the gate. Consequently, and contrary to previous procedure, the top of the fourth gate was not restrained in any way. Plaintiff testified that some effort was made to try to find either a piece of cable or something else to secure the top but that Vermillion declared that too much time was being spent in the search and that the process should go forward without a top restraint. Plaintiff also testified that Vermillion decided to pull this particular gate up the hill, rather than down the hill as with the previ-

ous sections. This meant that the truck was angled upward and the weight of the fourth gate was pulling away from the back of the truck, rather than leaning toward it as with the other sections.

During the final positioning of this fourth gate section, plaintiff's co-worker, Diamond, was in the bed of the truck working with a crowbar to keep the lower portion of the gate free from a trailer hitch on the lower rear of the truck. Vermillion ordered plaintiff to assist in securing the right side of the lower corner of the fence to the passenger side of the pick-up, while Vermillion himself worked on the left side. After the come-a-longs were attached, Vermillion then ordered plaintiff to assist Diamond in keeping the gate from becoming caught on the truck's trailer hitch. This required plaintiff to position himself near the ground in the center of both the gate and the back of the truck. Unfortunately, but not unexpectedly, while the men worked with a sledgehammer to loosen the gate from the steel post which had formerly held it in place, the top of the gate responded both to the movement and to the force of gravity and came crashing down on plaintiff causing severe injury to his shoulder and back.

At the trial, plaintiff testified that while the fourth gate was being moved, Tony Ricciardi (defendant's employee) was standing approximately six to eight feet away, watching the whole process. Ricciardi's only involvement in the entire operation was his questioning of Vermillion as to whether the repaired come-a-long would hold, and his inquiry into the possibility of finding something else to secure the top of the fourth gate in view of the broken third come-a-long. Testimony was also adduced that when plaintiff first arrived at the job site the morning of the accident, he was working by himself removing the electric gate operators from the gates. Ricciardi came by and the two men talked as plaintiff continued to work. During the conversation, the electric wires sparked and Ricciardi told plaintiff to "hold off a minute" while Ricciardi went to try and turn off the electricity. When Ricciardi came back

plaintiff tested the wires but they were still live. By agreement plaintiff and Ricciardi determined not to proceed further until someone could be found who knew how to shut off the electricity. Aside from this, there was no evidence that Ricciardi participated in the work, or was involved in any way in the decisions relating to its performance, including the placement of the employees, the handling or positioning of the come-a-longs, or even the position of the truck itself. Indeed Ricciardi, as an inspector for the City, was simply in and about the premises generally, and he never gave any orders or commands of any kind.

Upon completion of plaintiffs' case defendant SEPTA moved under Rule 50 for a directed verdict in its favor. Plaintiffs conceded that SEPTA's motion should be granted and it was so granted by the court. The defendant City of Philadelphia also moved for a directed verdict under Rule 50 and after oral argument and a discussion of the applicable legal principles, this motion was also granted.

During the oral argument on defendant's motion, plaintiffs took the position that even though U.S. Steel was an independent contractor, a case had been made out against the City of Philadelphia under the peculiar risk of harm doctrine embodied in sections 414 and 427 of the Restatement (Second) of Torts. Plaintiffs argued that a peculiar risk situation was created by the manner in which the gate was moved, and that the City of Philadelphia was vicariously liable because through the presence of its employee, Ricciardi, it was aware of that risk. The court concluded, however, that the circumstances presented by the present case did not fall within the type of situation contemplated by the peculiar risk sections of the Restatement. On this basis the court granted the Rule 50 motion in favor of the City of Philadelphia.

DISCUSSION

A. Peculiar Risk Doctrine—Sections 416 and 427

█ As a general rule, the employer of an independent contractor is not liable for

physical harm caused another by an act or omission of the contractor or his servants. *Hader v. Coplay Cement Co.*, 410 Pa. 139, 189 A.2d 271 (1963); *Gonzalez v. U.S. Steel Corp.*, 248 Pa.Super. 95, 1007, 374 A.2d 1334, 1340 (1977), *aff'd* 484 Pa. 277, 398 A.2d 1378 (1979); *McDonough v. U.S. Steel Corp.*, 228 Pa.Super. 268, 273–74, 324 A.2d 542, 545 (1974). *See* Restatement (Second) of Torts § 409. An independent contractor is in possession of the necessary area occupied by the work contemplated under the contract and his responsibility replaces that of the owner who is, during the performance of the work by the contractor, out of possession and without control over the work or the premises. *Hader v. Coplay Cement Co.*, 410 Pa. at 151, 189 A.2d at 277.

Plaintiffs invoke the exception to the general rule found in sections 416 and 427 of the Restatement (Second) of Torts (1965). These sections provide as follows:

§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427. Negligence as to Danger Inherent in the Work

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure

to take reasonable precautions against such danger.

■ The inherently dangerous activity doctrine of sections 416 and 427 [1] is an exception to the general rule regarding an employer's nonliability for injuries caused by the independent contractor's negligence. The doctrine imposes vicarous or respondeat superior liability on the employer based on the nature of the task and the dangers inherent in the work unless special precautions are taken. *Sharkey v. Airco, Inc.*, 522 F.Supp. 646, 653 (E.D.Pa.1981), *aff'd mem.*, 688 F.2d 824 (3d Cir.1982).

Thus, in Pennsylvania employers may be liable vicariously for the negligence of an independent contractor, irrespective of whether the employer has himself been at fault. *Gibson v. U.S.*, supra, 567 F.2d at 1244; *Toole v. U.S.*, supra, 443 F.Supp. [1204 at 1224] at 407 [E.D.Pa. 1977]. The requirements for application of Section 416 are (1) the independent contractor must commit an act of negligence which causes the plaintiff's injuries and (2) the work must involve a peculiar risk of harm requiring that special precautions be taken. *Nationwide Mutual Insurance Co. v. Philadelphia Electric Co.*, 443 F.Supp. 1140, 1145 (E.D.Pa.1977).

*Sharkey v. Airco, Inc.*, at 653.

Peculiar risk is defined in comment (d) to section 416 of the Restatement. Comment (d) states in pertinent part that a peculiar risk "is a risk different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work to be done which calls for special precautions." Restatement (Second) of Torts § 416 comment (d). Further guidance on the meaning of peculiar risk is offered by comment (b) to § 413 of the Restatement. Comment (b), which also defines peculiar risk, was

---

**1.** As the Third Circuit has previously stated, section 427 is "closely related to, and to a considerable extent a duplication of, [the rule] stated in § 416." *Gibson v. United States*, 567 F.2d

1237, 1243 n. 9 (3d Cir.1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978), (citing Restatement (Second) of Torts § 427, comment a).

expressly adopted by Pennsylvania in *Hargrove v. Frommeyer*, 229 Pa.Super. 298, 323 A.2d 300 (1974), and is cited "as applicable to this Section" in the comments to section 416. Comment (b) provides:

> It is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result.... This Section has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor....
>
> This Section is concerned with special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions. "Peculiar" does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself.

Despite these lengthy definitions, the meaning of peculiar risk remains elusive unless Restatement § 427 is considered. This is because section 416 does not provide any concrete guidance on how to distinguish between "normal" risks of harm which may be triggered by the "ordinary" negligence of an independent contractor and "special" risks of harm which are somehow inherent in the work task itself. Section 427 performs this task by discussing the concept of special danger inherent in the work and imposing certain distinct limitations on the peculiar risk doctrine.

Section 427 makes two things clear. In order for a risk to be considered peculiar within the meaning of the Restatement, it must first be a risk which is recognizable in advance and contemplated by the employer at the time the contract was formed. Restatement § 427 comments (b), (d), and illustrations 5 & 6. Second, it must not be a risk created solely by the contractor's "collateral negligence." *See* Restatement (Second) of Torts § 427 comment (d). Collateral negligence on the part of the contractor, discussed in § 426 of the Restatement,[2] refers to negligence consisting wholly of the improper manner in which the contractor performs the operative details of the work. Collateral negligence occurs where the negligence of the contractor creates a new risk, not inherent in the work itself or in the ordinary or prescribed way of doing it, and not reasonably to be contemplated by the employer. Restatement of Torts § 427 comment (d). The collateral risk limitation keeps the peculiar risk doctrine from totally undermining the general rule that the employer of an independent contractor is not liable for injuries to third persons caused by the contractor's negligence. The distinction between collateral negligence risks produced by the contractor's manner of performance, risks for which the employer is not liable, and pecu-

---

**2.** Section 426 of the Restatement (Second) of Torts reads:

§ 426. Negligence Collateral to Risk of Doing the Work

Except as stated in §§ 428 and 429, an employer of an independent contractor, unless he is himself negligent, is not liable for physical harm caused by any negligence of the contractor if

(a) the contractor's negligence consists solely in the improper manner in which he does the work, and

(b) it creates a risk of such harm which is not inherent in or normal to the work, and

(c) the employer had no reason to contemplate the contractor's negligence when the contract was made.

liar risks resulting from the very performance of certain work, risks for which the employer is liable, has been previously noted and applied in the Third Circuit. *Sharkey v. Airco, Inc.*, 522 F.Supp. 646, 654 (E.D.Pa.1981), *aff'd mem.*, 688 F.2d 824 (3d Cir.1982).

■ Reading together sections 416 and 427, and considering their respective comments which embrace comment (b) to section 413 and the text of section 426, the court concludes that the following test for the existence of a peculiar risk is appropriate. A risk may be deemed peculiar if:

1. the risk is recognizable or foreseeable in advance and contemplated by the employer at the time the contract was formed; and

2. the risk is different from the ordinary risks attendant to the type of work being done, arising out of either the place where the work is performed or the existence of some other unusual factor; and

3. a reasonable man familiar with the type of work being done would recognize the necessity of taking special precautions in view of this risk; and

4. the risk is not created by the contractor's collateral negligence.

■ In the present case the facts reveal, and plaintiffs concede in their brief, that the risk of harm involved in moving the fourth gate "arose out of the manner in which the work was done." Plaintiffs' Memorandum of Law at 11. This by itself precludes a finding that the present situation involved a peculiar risk. But even apart from this the court notes that under the circumstances presented the job of moving the heavy gate, assuming it had been done with routine and proper care, did not involve any type of risk which could be considered different from the normal risks borne by persons doing this kind of work. Merely because a job involves some risk of harm does not mean that the risk is necessarily peculiar. This should be obvious. As the court observed in *Sharkey v. Airco, Inc.*, 522 F.Supp. at 655, "[e]very type of

construction work involves a variety of risks of harm which are viewed by those engaged in the trade as normal incidents of the occupation." In order for the liability concepts involving contractors to retain any meaning, especially in industries such as construction where almost every job task involves the potential for injury unless ordinary care is exercised, peculiar risk situations should be viewed narrowly, as any other exception to a general rule is usually viewed.

■ In view of both the facts and their own concession, plaintiffs are not entitled to a new trial on their ground that the contractor's failure to secure the top of the gate created a peculiar risk of harm. Nor was the court in error in refusing to submit the question to the jury for their evaluation and determination. In clear cases the trial judge may determine as a matter of law whether a peculiar risk existed. *Sharkey v. Airco, Inc.*, 522 F.Supp. at 653 (*citing McDonough v. U.S. Steel Corp.*, 228 Pa.Super. 268, 276 n. 6, 324 A.2d 542, 546 n.b. (1974). For the reasons stated above, the present case is well within the class of cases where the peculiar risk question was clear.

**B. Retention of Control—Section 414**

Section 414 of the Restatement of Torts states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

As an alternative theory, plaintiffs argue that they should be granted a new trial since sufficient evidence was presented to create the jury question whether Restatement § 414 applied.

■ Initially, the court notes that plaintiff never advanced this argument in opposing defendant's motion for a directed verdict even though they had previously used it in opposing defendant's motion for sum-

mary judgment. Plaintiffs offer no reason for this lack of diligence on their part at the trial. Under Rule 59, Fed.R.Civ.P., it is clear that new trials should not be granted solely to permit the losing party to present arguments which could have been raised at trial but were not. *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 482 F.2d 710, 721 (D.C.Cir.1973), *rev'd on other grounds*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57; *Echevarria v. United States Steel Corp.*, 392 F.2d 885, 892 (7th Cir.1968). Plaintiffs' section 414 argument could be rejected on this ground alone, however, since it appeared from the course of their counsel's questioning that plaintiffs intended to rely on section 414 and since defendants were not surprised by the appearance of the issue in plaintiffs' memorandum, the court has considered plaintiffs' theory on its merits.

The only evidence that Philadelphia retained control over the work done by U.S. Steel was that Ricciardi, an inspector for the City, was present on the job site and engaged in the type of activity which an inspector might be expected to perform. Chief among those, he gave U.S. Steel lists of daily jobs to be completed in furtherance of the contract. He also was present and took part in the general discussion among the U.S. Steel employees on the day before the accident regarding how the gates should be moved. On the day of the accident, in the course of performing his duties as an inspector, he observed the actual work being done by the U.S. Steel employees, and even asked Vermillion, U.S. Steel's foreman, about the safety of the procedure. In addition, a portion of the testimony disclosed that on the morning of the accident, Ricciardi and plaintiff were involved in an exchange which plaintiffs cite as showing that Ricciardi had control over the work done by U.S. Steel. This testimony, from the direct questioning of plaintiff John Marshall, was as follows:

[On the morning of the accident]

A  We had started cleaning up the area around the area, like dirt, and we were taking off the gate leafs operators, which are electric operators on them to open and close the gates.

Q  During this time did you have any conversation with Tony Ricciardi?

A  I don't think he pulled up just then. He pulled up after we had started working a little bit.

Q  Did you have a conversation with Tony Ricciardi at some time?

A  Yes. Tony came up and asked how things were going, and we told him we had just finished cleaning up and we were starting to take the gate operators apart.

In the course of the conversation, he was standing there. As I was starting to take the electric wires off, they sparked, so we knew that the wires were live. So Tony said to hold off a minute while he went inside the building and tried to get the electricity cut off.

Q  Did you hold off on them?

A  Oh, sure.

Q  In other words, did you obey Tony when he told you to stop working?

A  Yes.

Q  Was there any further conversation concerning them?

A  He came back out and asked if it was all right again, and I jumped a couple of the wires to see if the juice was still in there, and it was. And we determined that we better not mess with it because apparently they couldn't find the right switch to cut the juice off.

Q  Did Tony tell you to stop working on them?

A  Basically, I would imagine, yes. It was kind of an agreement.

Q  By the way, Tony was not your boss, was he?

MR. GUTTSHALL: Excuse me, your Honor. That answer is not responsive to the question. He said basically—

BY THE COURT:

Q  All right. Did Tony tell you to stop working on them? We want to know yes or no, or you don't know or something.

A  I can't really quite recall what his words were. It was—we determined

that the wires were hot, and I can't remember whether he said, "Well, maybe you better let that go," or whether I told him I wasn't going to be electrocuted or what.

I don't remember exactly what was said at that point.

THE COURT: All right. He doesn't remember.

BY MRS. SCARLATA:

Q Was Tony Ricciardi your boss?

A No.

Q You had to obey him when he told you to stop?

A It's an accepted thing in the construction industry that an inspector on the job has any suggestions to make at all and you try to adhere to his wishes. I mean, that's something I worked with all along.

Notes of Testimony, Dec. 5, 1983 at 99–101.

■ Viewing the plaintiffs' evidence in its most favorable light, it is perfectly plain that the City of Philadelphia did not exercise control over the manner in which the work was done. To the contrary, the evidence considered in its entirety showed that U.S. Steel had full authority to control and direct the performance of the work as it saw fit; it hired all the employees required to do the work, provided them with tools and equipment, instructed them on the operative details of their work, and supervised the overall operation. U.S. Steel had complete control over all decisions relating to the job of moving the gate, including the choice of method, equipment, tools, timing, placement of the cables, positioning of the truck, and positioning of the men. The very condition that plaintiffs contend caused the accident resulted from the position of the truck and U.S. Steel's unwillingness to take time to find something to secure the top of the fourth gate. These circumstances were the product of U.S. Steel's decisions, and the evidence clearly revealed that the City of Philadelphia had no right and claimed no power to interfere with U.S. Steel's decisions on the conduct of the work. Indeed when Ricciardi, the City's inspector, asked whether something could be found to se-

cure the top of the fourth gate, he was effectively overruled by Vermillion, the U.S. Steel foreman, who was concerned that the search was taking too much time.

Ricciardi's minor role in the electric gate incident does not alter the result. Plaintiff's own testimony was that he didn't remember exactly who said what but that "[b]asically ... [i]t was kind of an agreement" between plaintiff and Ricciardi that plaintiff should stop working on the gates until the electricity could be shut off. Notes of Testimony, Dec. 5, 1983 at 100. Moreover, when asked at trial, plaintiff stated that Ricciardi was not his boss. *Id.* at 101. This brief and inconclusive exchange regarding the electric gate was insufficient to create a jury question on retention of control by the City of Philadelphia. *See Sharkey v. Airco, Inc., supra,* 522 F.Supp. 649–652, and 652 n. 10. At best the evidence revealed that the City, through its inspector, gave plaintiff assistance in a situation involving a basic principle of safety. The court does not believe that this is enough to hold the employer of an independent contractor liable. To rule otherwise would have the unfortunate result of discouraging employers and their agents, who are frequently on the work site to ensure fulfillment of their contracts, from making even obvious safety suggestions which might occur to them as they observe the work in progress. Under the facts presented plaintiffs were not entitled to have the jury consider the question of control and even assuming that plaintiffs had argued this theory at trial, the court still would have granted defendant's motion for a directed verdict.

An appropriate Order will be entered.

### ORDER

AND NOW, TO WIT, this 7th day of May, 1984, for the reasons stated in the foregoing Memorandum, IT IS ORDERED that plaintiffs' motion for a new trial is *denied.*