Grace, Appellant, *v.* Henry Disston & Sons, Inc.

Argued November 26, 1951.   Before Drew, C. J.,
Stern, Stearne, Bell, Ladner and Chidsey, JJ.

*Paul Yermish,* with him *Joseph Ominsky* and *Malcolm Berkowitz,* for appellant.

*Michael A. Foley,* for appellee.

Opinion by Mr. Justice Chidsey, January 7, 1952:

Plaintiff, Michael Grace, sued defendant, Henry Disston & Sons, Inc., in trespass to recover damages for injuries sustained as the result of an accident which occurred on December 1, 1947 at defendant's plant in Philadelphia. The jury returned a verdict in favor of plaintiff. This appeal is from judgment *non obstante veredicto* entered on motion of the defendant.

In the early part of November in 1947 the defendant entered into a contract with the Bolger-Parker Company, a concern doing rigging work, to move from one location to another in a large building on defendant's property called the armor shop a number of industrial machines, including a punch press, a bending brake, a hydraulic press and a shear. The employes of the contractor began their work in the early part of November. They had been there for approximately a month when the task of moving the large shear machine, weighing about 50 tons, was considered. Larson,

the foreman of the Bolger-Parker Company and in charge of the removal, and Miller, defendant's superintendent of maintenance, together went to the location of the shear and Larson then informed Miller what things he wanted moved from the location so that the shear could be moved by his men. This was done pursuant to an understanding between the defendant and the contractor that the work locations would be made suitable by the defendant to the satisfaction of the contractor. The defendant moved everything suggested or requested by the contractor's foreman to the latter's complete satisfaction; and the contractor went into possession of the portion of the plant required for the removal of the machine without any occupancy or interference by the defendant.

The shear to be moved was located about 6 to 8 feet from the wall of the shop. It was approximately 12 feet high, 15 feet long and was in the shape of an open rectangle with large cutting edges at the front, with its back toward the wall. Stacked against this wall in a corner of the building to the rear of the shear were a number of steel bars in round and hexagonal shapes which were parts used in the operation of the shear. These bars varied in length, one or more of them being 12 feet long. Each weighed approximately 110 pounds. They were set up in a leaning position on an angle against the wall. During the removal of the shear by the contractor, the defendant continued its operation of the remainder of the plant.

On the afternoon of November 30th certain employes of the contractor, other than plaintiff, commenced work on the removal of the shear. On December 1st, the following day, the plaintiff, a truck driver and helper in the employ of the contractor, delivered additional equipment to the crew working about the shear. He backed his truck into the armor shop and parked

it approximately 30 or 40 feet away from the shear. He arrived at the plant about 11:30 A.M. He unloaded a few pieces of equipment, went to lunch, and upon his return at or about 1:30 P.M., Larson, the contractor's foreman, requested plaintiff to assist him in placing some blocks or shims under the shear at a point near the wall and to the rear of the shear. The plaintiff knelt down beside the foreman and while passing the blocks or shims to him one of the bars from the corner fell, striking the right hand of the plaintiff causing serious injuries. The bar that fell was 12 feet in length.

Plaintiff contended that the bar fell because of vibration in the plant. William Q. Bell, one of the contractor's employes, called by the plaintiff, testified, "Well, there is no machinery running, they are perfectly safe. Whenever there is vibration in the plant, those bars will fall down." Upon cross-examination by plaintiff's counsel, Miller, defendant's superintendent and in charge of maintenance in the armor shop, testified that bars had been stacked in the same manner for two years, being used from time to time in connection with the running of the shear and that he did not consider the stacking of the bars to be dangerous. Likewise Larson, the contractor's foreman, testified that as far as he knew the bars had been standing there for weeks and he did not consider them dangerous.

The extent of the duty of the owner of a building who employs an independent contractor to the latter's employes, with respect to known or discoverable dangerous conditions existing on the premises where the work is to be done, is to warn the contractor of their existence; he is not required to warn every subcontractor and laborer who comes on the premises: *Valles v. Peoples-Pittsburgh Trust Company,* 339 Pa. 33, 13 A.2d 19. The owner owes no duty to the employes of a contractor with respect to a dangerous condition which is

known to the contractor: *Engle v. Reider,* 366 Pa. 411, 77 A.2d 621; *Newingham v. The Blair Company,* 232 Pa. 511, 81 A. 556. Defendant contends that the contractor was expressly made aware of the dangerous possibilities. William Bell, the employe of the contractor above mentioned, during his examination as a witness for plaintiff testified as follows: ". . . The relative position of the machine [the shear] made it such that I complained. Bill Parker also made a complaint and my brother Mack made a complaint. Q. Who did you complain to? A. The foreman, Oscar Larson. Q. Whose foreman is that? A. The Bolger Parker Company foreman. Q. When did you do that? A. Before we started to work. Q. That was on November 30, 1947? A. That's right. Q. What time of the day did you make that complaint? A. Approximately one o'clock when we went to work on that machine? Q. What was the name of that foreman? A. Oscar Larson. By Mr. Yermish: Q. What did you complain about? . . . By the Court: Q. You complained to Oscar Larson your foreman? A. Yes. Q. What did you tell him? A. We told him— Q. Not what 'we told him'—you? A. I said, 'Those parts standing there in the corner would not be safe with the shop in operation because with us working around there they might fall over and hit us.' That was my complaint. Q. You thought it was dangerous? A. Yes, sir. Q. You told Mr. Larson that how many times? A. I complained to him that afternoon. I complained to him the next morning. Q. Did you hear anybody else complain to him? A. Yes. Q. Who? A. My brother, Mack Bell, he was a rigger in the gang. Another rigger in the gang was Bill Parker. He also complained. Q. You told Oscar Larson about this. Your brother and the other gentleman told Oscar Larson about this. What did Mr. Larson say? A. It

is hard to quote. I understood him to say they would be moved. That is what I understood him to say. By Mr. Yermish: Q. By whom? A. That is all he said. He said they would be moved. Q. Were they moved? A. They were moved after Mike was injured."

Upon cross-examination by plaintiff's counsel, Larson testified as follows: ". . . Did Mr. Bell complain to you of the conditions around there at the time they started to work? A. That is a thing I don't remember—not after four years. Q. You don't remember whether Mr. Bell complained to you that day? A. No, I don't. Q. Did Mr. Bell complain to you the following day? A. What was that? Q. On the morning of the accident, did Mr. Bell complain to you? A. I don't remember. Q. You remember Bell? A. Yes. Q. He is a pretty hard man to forget. He said, 'I complained to Oscar Larson, our foreman. I saw bars standing there in the corner and saw it wouldn't be safe during the operation of the job.' He felt that the bar might fall and hit us. He said he complained also the next morning. He said that Mac Bell and Bill Parker also complained. You heard him say that today. A. I heard him say that today. That is more than I know of. Q. What does that mean? Did he never say anything or that you don't remember? A. I don't remember. I didn't hear him. I don't know whether he did or not. Q. You don't remember whether he said it? A. No, I don't. Q. Your hearing is good? A. My hearing is very good. Q. Will you say that he did not say it? A. No, I wouldn't say that."

Defendant contends that Larson's testimony to the effect that he did not remember Bell's complaint was negative testimony, insufficient to overcome the positive testimony of Bell that he complained; and that the plaintiff having held Bell out as worthy of belief and his testimony not being contradicted, he is bound by

that testimony. Defendant relies on the railroad crossing cases where negative testimony of witnesses that they did not hear sound warnings has been held under certain circumstances insufficient to overcome positive testimony that such warnings were given. In *Edmundson's Estate*, 259 Pa. 429, 103 A. 277, where parol evidence was held properly admitted to show the consideration for the conveyance of real estate was other than that expressed in the deed, reliance was had by claimant on the deceased grantee's oral promise. In commenting on testimony of witnesses opposing the claimant, this Court said, "Three sons and a daughter of the decedent were called to testify against the claim, but their testimony is simply to the effect that they did not hear their mother make the promise or reaffirm it, and did not hear of the claim until shortly before their mother's death. There was no substantial contradiction of the testimony introduced by the claimant, and, hence, the learned auditing judge very properly found that 'the evidence by which the claim is established is uncontradicted.' "

In the instant case undoubtedly the negative testimony by Larson was outweighed by the positive testimony of Bell. The question remains whether Larson's testimony under the circumstances was nevertheless of some probative force, sufficient to make the issue of contradiction one for determination by the jury. It is to be observed that in addition to testifying that he, Bell, complained to Larson, Bell testified that he also heard his brother, Mack Bell, and his fellow employe, Parker, similarly complain to Larson. While Larson testified specifically that he did not remember Bell's complaint, there was no definite answer made by him with respect to the complaints by Bell's brother and by Parker. We deem it extremely doubtful that there was sufficient contradiction of

complaint having been made. If made, Larson, and therefore the contractor, was apprised of dangerous possibilities.

However, the disposition of the case need not rest upon proof that the contractor was expressly warned or notified of conditions that were potentially dangerous. This was not a case of a hidden or latent defect. The contractor as well as the defendant owner knew of the stacking of the bars and of the vibration caused by the operation of the plant. The contractor was, therefore, just as cognizant of the condition existing as was the owner. The latter did not enjoy any superior knowledge and it was unnecessary for him to warn the contractor of conditions that were as obvious and appreciable in their import to the contractor as to the owner.

The work was performed under conditions prescribed by the contractor and after the owner removed all materials to clear the place to the satisfaction of the contractor, the latter remained in sole control of the work location. This makes the cases relied on by appellant distinguishable and inapplicable. In *Straight v. B. F. Goodrich Company*, 354 Pa. 391, 47 A.2d 605, plaintiff was the employe of the Otis Elevator Company engaged in repairing an elevator on the defendant owner's premises. He was injured when an unattached radiator resting against a wall on one of the floors of defendant's building near the elevator shaft toppled over and fell upon him. The defendant was *in occupancy* of the premises where the accident happened and was, therefore, held liable. In *Kulka v. Nemirovsky*, 314 Pa. 134, 170 A. 261, the employe of a purchaser entering the premises of the vendor to remove the article sold was injured on the premises which were *in the possession and occupancy* of the defendant vendor. In *Debenjak v. Parkway Oil Company*, 159 Pa. Superior Ct. 603, 49 A.2d 521, plaintiff was in the

employ of a contractor who engaged to paint the defendant's storage tanks and other structures on its premises in Philadelphia. However, the contractor was not given exclusive possession and control of the work but defendant remained therein and directed the work from time to time through its maintenance engineer.

Other cases cited by appellant are equally inapposite. We are of the opinion that the court below properly set aside the verdict.

Judgment affirmed.