## Palenscar v. Bobb, Inc.

Before Sloane, Jamieson and McDevitt, JJ.

*Sidney L. Weinstein,* for plaintiff.
*T. E. Byrne, Jr.,* for defendants.

McDEVITT, J. August 6, 1969.—Elmer A. Palenscar and Son is a partnership engaged in the electrical contracting business. The partners in the firm are Elmer A. Palenscar (hereinafter "Palenscar Sr.") and Elmer J. Palenscar (hereinafter "Palenscar Jr."). Palenscar Jr. is plaintiff in the present action.

On July 13, 1964, Palenscar and Son received a call for service from Michael J. Bobb, Inc. (hereinafter "Bobb"). A malfunction had occurred in the electrical system of a warehouse leased by Bobb and located at Front and Shunk Streets in Philadelphia. Palenscar Sr. responded to the service call and went to the warehouse to try to locate the malfunction and correct it.

Palenscar Sr. called the Philadelphia Electric Company for assistance. A representative of the electric company came to the premises, made certain tests and informed Palenscar Sr. that the trouble was not in the primary 13,200 volt system. Further testing revealed that the main switchboard was operational. A determination having thus been made that correction of the malfunction was not Philadelphia Electric's responsibility, the representative of that company left the premises.

Palenscar Sr. determined that he needed a coil of wire and telephoned his office for it. The message was received by Palenscar Jr., who brought the wire to the warehouse. Palenscar Sr. had also contacted Beeman Electric Company to request that they supply him with meters to check the current; William Lawler, an employe of Beeman, had arrived at the warehouse with the meters an hour before Palenscar Jr. arrived. Lawler remained with Palenscar Sr. in order to assist him on the job.

Before Palenscar Jr. arrived, Palenscar Sr. and Lawler were checking out the electrical system in the east end of the warehouse. The two men performed their troubleshooting procedures with the power to this part of the premises shut off. Only after it had been determined that the malfunction was not in the part of the electrical system that served the east end of the building did Palenscar Sr. restore power to that part of the building.

After he had brought the coil of wiring to his father, Palenscar Jr. remained at the warehouse to assist on the job. Because his father and Lawler were already working on the electrical system for the east side of the building, Palenscar Jr. decided to begin checking out the west side of the building, which was also affected by the power failure. In the course of his efforts to locate the malfunction, Palenscar Jr. climbed to the top of a crate and began to remove the cover from a

switchgear box. The voltage coming into this box (on the "line side") was 550 volts; the voltage leaving the box was 110 volts (on the "load side"). As Palenscar Jr. was removing the cover from the box, there was a blinding flash of light and an explosion, and Palenscar Jr. fell to the floor, his clothing in flames and the skin on his upper body and face seared. The painful injuries received by Palenscar Jr. on his face, arms, hands and torso caused him to be hospitalized for almost a month. He could not perform his usual work for about five months after the accident, although he did perform work of a supervisory nature. He suffered permanent disfigurement of the skin on his left hand and arm as well as a measure of atrophy in the left arm.

Palenscar Jr. brought the present action against Bobb to recover damages for the injuries received in the accident. The case came to trial before the Hon. Joseph Sloane, sitting without a jury, on April 24 through April 28, 1967. Judge Sloane found a verdict for plaintiff in the amount of $51,000. A court en banc consisting of Judges Sloane, Jamieson and McDevitt, granted defendant's motion for judgment n.o.v., Judge Sloane dissenting.

The record clearly shows that defendant knowingly maintained a faulty and dangerous electrical system in its warehouse. Palenscar Sr. himself told one of Bobb's principals on the date of the accident and prior to its occurrence "that the whole system was obsolete, dangerous." Nor was this the first time the dangerous condition of the electrical system had been brought to Bobb's attention. Palenscar Sr. testified: "I raised it ever since the first day we got there, the condition of that plant." There is no doubt then that defendant maintained an electrical system known to be obsolete and dangerous. However, plaintiff can recover only if defendant breached a duty owed to plaintiff.

Plaintiff was a business invitee on Bobb's premises. Under Pennsylvania law, there is no duty incumbent upon a possessor of land to warn an invitee of a danger which is at least as obvious to the invitee as it is to the possessor: Repyneck v. Tarantino, 415 Pa. 92, 95 (1964). Palenscar Jr. knew of the dangerous condition of the electrical system. Palenscar Sr. had made more than 100 emergency service calls to keep Bobb's electrical system functional in the short period of a year and a half. Palenscar Jr. had personally worked on the system during some of these emergencies. In addition, Palenscar Jr. had performed two major jobs involving electrical installations on the premises. There is little doubt that plaintiff knew of the dangerous condition of the entire electrical system.

Further, the information known by Palenscar Sr. must be imputed to Palenscar Jr. A possessor of land owes no duty to warn employes of an independent contractor of a dangerous condition when the existence of such condition is known by the independent contractor: Engle v. Reider, 366 Pa. 411, 416-17 (1951); Valles v. Peoples-Pittsburgh Trust Company, 339 Pa. 33 (1940). See also Grace v. Henry Disston & Sons, Inc., 369 Pa. 265 (1052). Although Palenscar Jr. was not technically an employe, he was assisting his father, who was the first on the scene and in control of the work. Under the circumstances, Palenscar Jr.'s position is completely analogous to that of an employe and if there was a duty to warn Palenscar Jr. that duty rested on Palenscar Sr. and not on Bobb.[1]

These facts show the Palenscars, Sr. and Jr., were at least as cognizant of the dangers in the electrical system as defendant. Accordingly, defendant owed no

---

[1] Unlike the situation in Cooper v. Heintz Manufacturing Company, 385 Pa. 296 (1956), the independent contractor here had control over the electrical system, and plaintiff here was an experienced electrician who should have been familiar with the hazards involved in testing the electrical system on which he was working.

duty to plaintiff to warn him of dangers in the electrical system and, consequently, is not liable to plaintiff for the injuries sustained.

The Restatement, Torts 2d §343, provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

Although defendant knew that it was maintaining a highly dangerous condition on the premises, defendant also had reason to assume that plaintiff already knew the danger and would take sufficient precautions to protect himself. Given the expertise of Palenscar Jr. in dealing with electrical systems and his specific knowledge of defendant's electrical system, defendant had reason to assume that whatever dangers it was aware of were equally well known to plaintiff. Defendant's failure to warn plaintiff was not a failure to exercise reasonable care for the latter's protection. In other words, the record does not show that defendant was aware of a danger that it could reasonably foresee would not also be known to plaintiff.

Both the Pennsylvania cases and the restatement require a finding that defendant did not breach a duty it owed to plaintiff.

Considerable emphasis was placed on the issues of assumption of risk and contributory negligence both at trial and in post trial argument. Defendant relied on the fact that Palenscar Jr. could have tested the electrical system with the current shut down, instead

of testing the system "hot." Plaintiff, on the other hand, relied on the testimony of Palenscar Jr. and of an expert witness, Morton H. Lerner, that the testing of the system with the power cut off would have been impractical and time consuming and that it was the general practice in the electrical contracting business to test for malfunctions with the power on.

The fact that plaintiff followed the general practice of his trade in "hot-testing" the system is some evidence that plaintiff was not negligent. However, "Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gauged. The standard of due care is such care as a prudent person would exercise *under the circumstances of the particular case,* and conformity to customary or usual conduct or methods cannot amount to more that a circumstance to be considered together with other circumstances of the case in determining whether due care has been exercised": MacDougall v. Penna. Power & Light Co., 311 Pa. 387, 397 (1933). (Italics supplied.)

Although the general practice of the electrical contracting trade might indeed sanction hot-testing of a sound electrical system as the most practical and efficient method of locating a particular malfunction, it is debatable whether such a practice would apply to the testing of a known faulty, obsolete and dangerous system. Common prudence should tell the electrician that his normal procedure in troubleshooting a sound system will not afford the same degree of safety when he is working on a system that is in a dangerous state of overall disrepair. Nevertheless, we are unwilling to declare that plaintiff was guilty of contributory negligence as a matter of law on the ground that he chose to work on defendant's electrical system with the power turned on rather than shutting off the power before commencing his work. The issue of contributory negligence was one of fact,

and the trial judge had sufficient evidence upon which to base his conclusion that plaintiff was not contributorily negligent in choosing to test the system "hot."

Similarly, we do not find that plaintiff assumed the risk of his eventual injuries by choosing to work on the system with the current turned on rather than off. "Assumption of the risk" in the present case is merely the other side of the coin in our determination that defendant has breached no duty toward plaintiff. Long before the date of plaintiff's accident, Palenscar and Son had a clear choice between keeping operational an obsolete and highly dangerous electrical system for Bobb or turning down the business because of the hazards involved. That choice was presented to them again each and every time Bobb put in a call for emergency service. The testimony of Palenscar Sr. aptly illustrates the alternatives open to Palenscar and Son and the reason for the choice that was made:

"A [By Palenscar Sr.] I told him [Mr. Leno, president of Bobb] what I orginally said, that the whole system was obsolete, dangerous, the transformer outside the building, with high tension wires running all over there, I told him he ought to get the company or whoever owned the building to rip the stuff out and put a job in.

"Q [By Mr. Byrne, defense counsel] But, nevertheless, you went ahead and worked there?

"A He was an old customer of ours for many years. We can't turn down a man like that."

Comment e to section 343A of the Restatement, Torts, 2d,[2] explains the relationship between the

---

[2] Section 343A is entitled "Known or Obvious Dangers." Subsection (1), which is here pertinent reads: "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." The section was cited in support of the decision in Mike v. Lebanon Miridites League, 421 Pa. 217, 220 (1966).

duty owed by the possessor of land and the assumption of risk by the invitee in the situation outlined by the testimony of Palenscar Sr.:

"In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so."

Under the facts of the present case, it is clear that Palenscar and Son chose to risk the hazards inherent in maintaining Bobb's obsolete electrical system rather than risking the loss of Bobb's business. As we have already observed, the knowledge of Palenscar Sr. and his prior presence at the work site and control over the job at the time of Palenscar Jr.'s arrival are sufficient to insulate Bobb from liability to Palenscar Jr. even if the latter's knowledge of the hazards involved was not equal to his father's.

An employe who chooses to continue working under conditions which he knows are unsafe must be deemed to have assumed the risk of injuries resulting from those very conditions: Repyneck v. Tarantino, 415 Pa. 92 (1964). We see no reason why an independent contractor should not also be deemed to have assumed the risk of injuries incurred in working under hazardous conditions when he has a knowledge of the hazards equal, and probably superior, to the knowledge of the person contracting for his services.