**Lieberger v. Walter Company**

C.P. of Fayette County, no. 667 of 2000, G.D.

*Joseph E. Ferens Jr.,* for plaintiff.

*Edward A. Miller* and *Eugene A. Giotto,* for defendants.

SOLOMON, *J.,* May 11, 2005—Before the court is a motion for summary judgment filed by one of the defendants, Coolspring Stone Supply Inc. The motion alleges that there exist no genuine issues of material fact and that, therefore, the defendant is entitled to judgment as a matter of law. After careful consideration of the record, this motion must be granted in part and denied in part.

## BACKGROUND

The plaintiff's complaint arises from an accident that occurred on March 30, 1998, at the defendant's quarry on Jumonville Road in Uniontown, Pennsylvania. The plaintiff and his supervisor, Dwayne Krumanacker,[1] were installing a new ground wire in a wiring trough as part of a general upgrade of one of the mine tunnels when an explosion occurred, burning both the plaintiff and Krumanacker.

The wiring trough measures approximately 12 feet in length and is approximately one foot high and one foot deep. It is mounted on the rear wall of the secondary control house and contains a series of electrical wires and connecting blocks that allow electrical power to flow to the various machinery in the mines. A 12,470/7,200-volt, three-phase, four-wire line runs from the outside pole to a transformer, also outside, which converts the power into three 480/277-volt, three-phase lines. Those

---

1. Dwayne Krumanacker is a partner in Krumanacker Electrical, an independent electrical contractor contracted by Coolspring. Mr. Krumanacker has also filed a suit regarding this incident. His suit, however, does not include Coolspring as a defendant.

three 480-volt lines run into the secondary control house and into the wiring trough, where they are split into three segments with each segment terminating in a three-pole connector block with a single-pole ground lug.[2] Each connector block contains three U-shaped connectors, which allow the 480-volt lines to be connected to the power lines for the various machinery and which are insulated and are intended to keep the electrical lines from touching each other, or anything else, to avert the creation of an electrical short.

On March 30, 1998, the plaintiff and Krumanacker were installing a new ground wire in the wiring trough. Towards the end of the project, both the plaintiff and Krumanacker were kneeling on a rubber pad in front of the center of the wiring trough, the plaintiff to the left of Krumanacker, when an explosion occurred on the left side of the box. Both the plaintiff and Krumanacker were thrown backwards by the explosion, and the plaintiff's clothes caught fire. Both men suffered burns, with the plaintiff's burns being much more severe than those suffered by Krumanacker.

Both men were flown by medevac helicopter to Mercy Hospital in Pittsburgh. Krumanacker was admitted overnight for observation and then released. The plaintiff remained in the hospital for 14 days, receiving treatment for burns over 40 percent of his body. He was then transferred to his parents' home where he received home nursing care for an additional three weeks. The plaintiff has undergone continuing medical treatment for his burns,

---

2. These blocks are variously referred to throughout the record as connector blocks, power-distribution blocks and terminals. For the sake of clarity, we shall refer to them solely as connector blocks, regardless of the term or terms used in the record.

including skin grafts on his chin and both arms, and plastic surgery to correct scarring to his lip. His left arm has slightly diminished functioning due to the inflexibility of the scarred skin; the scarring is scheduled to be corrected in the future. To prevent infection or injury to his healing skin, the plaintiff wore a protective shirt for approximately one year after the explosion and wore a protective sleeve on his right arm for one year following a skin graft in March 2001. He applies moisturizing cream to the scarred areas everyday to prevent the scars from drying out. The plaintiff has returned to full-time work for Krumanacker Electric.

Both the federal Mine Safety and Health Administration (MSHA) and the state Bureau of Mining and Reclamation investigated the explosion. MSHA issued a citation on the evening of the incident, prohibiting any work on or in the mine until the electrical explosion had been fully investigated and remedial action taken. Coolspring asked Krumanacker Electric to install a disconnect switch between the transformer and the wiring trough, and MSHA lifted the citation. No further citations have been issued by either MSHA or the Bureau of Mining regarding this incident.

The plaintiff filed suit against 15 defendants. Most of these claims sound in products liability; however, the claim against Coolspring sounds in negligence under two theories. The first is property owner liability and the second is negligence per se. In its answer, a co-defendant, FCI USA Inc., filed, as a new matter, a cross claim against Coolspring under Pa.R.C.P. 2252(d), echoing the plaintiff's negligence claims and demanding contribution. Coolspring subsequently filed for summary judgment against both the plaintiff and FCI.

## DISCUSSION

Motions for summary judgment are governed by Pa.R.C.P. 1035.2, which provides:

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law:

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2.

The purpose of the summary judgment rule is to eliminate cases prior to trial where a party cannot make out a claim or defense after relevant discovery has been completed. *Miller v. Sacred Heart Hospital,* 753 A.2d 829 (Pa. Super. 2000). It is not the function of the court ruling on a motion for summary judgment to weigh evidence and to determine the truth of the matter. *Keenheel v. Pennsylvania Securities Commission,* 134 Pa. Commw. 494, 579 A.2d 1358 (1990). Further, summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, admissions on file, together with any affidavits . . . demonstrate that there exists no genuine issue of fact" and that the moving party is entitled to judgment as a matter of law. *Janson v. Cozen & O'Connor,* 450 Pa. Super. 415, 423, 676 A.2d 242, 246 (1996).

Under Rule 1035.2(2), if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his cause of action. *Ertel v. Patriot-News Co.,* 544 Pa. 93, 102, 674 A.2d 1038, 1042 (1996), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed. 2d 401 (1996). The non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party, and may not rest upon the averments contained in its pleadings. *Amabile v. Auto Kleen Car Wash,* 249 Pa. Super. 240, 376 A.2d 247 (1977). The non-moving party must also demonstrate that there is a genuine issue for trial. *Id.;* Pa.R.C.P. 1035.2(2). If the non-moving party fails to satisfy this burden, a genuine issue of material fact does not exist and the moving party is entitled to judgment as a matter of law. *Tenos v. State Farm Insurance Co.,* 716 A.2d 626 (Pa. Super. 1998).

In determining whether summary judgment should be granted, the court must examine the record; any inferences must be viewed in the light most favorable to the non-moving party, and any doubt must be resolved against the moving party. *Potter v. Herman,* 762 A.2d 1116 (Pa. Super. 2000).

The court must also be aware that oral testimony alone, either through testimonial affidavits or depositions, of the moving party or the moving party's witnesses, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact. *Nanty-Glo Boro. v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932); *Penn Center House Inc. v. Hoffman,* 520 Pa.

171, 553 A.2d 900 (1989). If the moving party has supported the motion with oral testimony only, the non-moving party may raise the defense that there is a genuine issue of material fact because the cause of action is dependent upon the credibility and demeanor of the witnesses who will testify at trial. *Id.*

This long-standing rule, and its modern application, are perhaps best summarized by the Superior Court in *Dudley v. USX Corp.,* 414 Pa. Super. 160, 606 A.2d 916 (1992):

"A review of [the precedents] demonstrates that there is an inherent three-step process involved in determining whether the *Nanty-Glo* rule applies so as to preclude a grant of summary judgment. Initially, it must be determined whether the plaintiff has alleged facts sufficient to establish a prima facie case. If so, the second step is to determine whether there is any discrepancy as to any facts material to the case. Finally, it must be determined whether, in granting summary judgment, the trial court has usurped improperly the role of the jury by resolving any material issues of fact.

"It is only when the third stage is reached that *Nanty-Glo* comes into play. Thus, it is true that *Nanty-Glo* precludes summary judgment where the moving party relies solely upon testimonial affidavits and depositions of his witnesses to resolve material issues of fact. However, if there are no material issues of fact, or if the non-moving party has failed, in the first instance, to allege facts sufficient to make out a prima facie case, then summary judgment may be granted properly, even if the moving party has only set forth the pleadings and depositions of his witnesses in support thereof. . . . Error only occurs if the moving party, in relying upon the testimonial affidavits of his witnesses, is attempting to resolve a

material issue of fact, or more importantly, is attempting to demonstrate the lack of any material issues of fact by asserting that the testimony of his witnesses is uncontradicted." *Id.* at 168-69, 606 A.2d at 920. (footnote omitted)

With these principles to guide us, we will now consider the motion of Coolspring for summary judgment.

Coolspring argues that the plaintiff has failed to establish an essential element of his negligence claims in that the plaintiff has produced no evidence that Coolspring owed a duty to the plaintiff or that, assuming there was a duty, the defendant breached that duty. Taking the pleadings in the light most favorable to the plaintiff as the non-moving party, the plaintiff has claimed two types of negligence: simple negligence based on property owner liability and negligence per se based on failure to conform to a statutory duty.

In order to prove simple negligence, the plaintiff must show that the defendant owed him a duty, that the defendant breached that duty, that he suffered damages, and that the defendant's breach of duty was the cause of plaintiff's damages. *Brisbine v. Outside In School of Experiential Education Inc.,* 799 A.2d 89 (Pa. Super. 2002); *Miseo v. Ross Township Police Department,* 147 Pa. Commw. 263, 607 A.2d 806 (1992). We will discuss these elements outside of the normal order.

There is no dispute that the plaintiff was injured. He suffered severe burns in the electrical explosion and, as a result, has undergone years of medical treatment, including skin grafts. Thus, the plaintiff has shown that he suffered damages.

There is also no dispute that the plaintiff was injured as a result of the electrical explosion, which occurred while he and Krumanacker were installing a new ground

wire in the wiring trough located in the secondary operations house. Thus, provided that the plaintiff proves that Coolspring was responsible for the explosion, he has also proven the causation element.

With those determinations, we are left to examine whether Coolspring owed the plaintiff a duty. The issue of whether the defendant owed the plaintiff a duty of care is the primary question in a negligence suit. *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166 (2000). In determining whether a duty of care exists, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that that particular plaintiff is entitled to protection from that particular harm. *Id.*

"The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Id.* at 553, 756 A.2d at 1169. (internal citations omitted)

Under the plaintiff's first theory of negligence, he argues that Coolspring owed him a duty as the owner of property. Typically, a property owner's duty towards a third party on its property depends on the status of the third party. Third parties are generally divided into three categories: trespassers, licensees, and invitees. There appears to be no dispute in the record that the plaintiff and his employer, Krumanacker Electric, were invitees; accordingly we will treat them as such. Further, Pennsylvania law recognizes employees of independent con-

tractors as invitees who fall within the classification of business invitee. See *e.g., Darrah v. Jones and Laughlin Steel Corp.,* 397 Pa. 334, 155 A.2d 201 (1959). The duty of care of a property owner towards its invitees is outlined in the Restatement (Second) of Torts:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger." *Gardner v. Consolidated Rail Corp.,* 524 Pa. 445, 452, 573 A.2d 1016, 1019 (1990) (citing Restatement (Second) of Torts §343).

It would seem, then, that this should be a simple analysis. It is complicated, however, by the parties' admissions that Krumanacker Electric, and therefore the plaintiff, was working at Coolspring's facility as an independent contractor.

Krumanacker Electric's status as an independent contractor changes, somewhat, the duty that Coolspring owes to the plaintiff.

An independent contractor is in possession of the necessary area occupied by the work contemplated under the contract and his responsibility replaces that of the owner who is, while the contractor is performing the work, out of possession and without control over the work or the premises. *Brletich v. U.S. Steel Corp.,* 445 Pa. 525,

531-32, 285 A.2d 133, 136 (1971) (citing *Hader v. Coplay Cement Manufacturing Co.,* 410 Pa. 139, 189 A.2d 271 (1963)). An owner of land who delivers temporary possession of a portion of that land to an independent contractor owes no duty to the employees of the independent contractor with respect to an obviously dangerous condition on the portion of land in the contractor's possession. *Brletich, supra* at 531, 285 A.2d at 136 (citing *Grace v. Henry Disston & Sons Inc.,* 369 Pa. 265, 85 A.2d 118 (1952)). "[W]hen he turns the work over to an independent contractor with experience and know-how, who selects his own equipment and employees, the possessor of land has no further liability in connection with the work to be done." *Brletich, supra* at 532, 285 A.2d at 136 (quoting *Hader, supra*). Thus, it would seem that, under this rule, Coolspring owes no duty to the plaintiff because the plaintiff was an independent contractor.

The plaintiff argues, however, that Coolspring owes him a duty under sections 416 and 427 of the Restatement (Second) of Torts. These sections state:

"Section 416. One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

"Section 427. One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contem-

plates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger." Restatement (Second) of Torts §§416, 427.[3]

The interaction of these two Restatement sections, and the general rule on property owner liability for independent contractors, has been explored by the courts in several cases. We find *Brletich, supra; Colloi v. PECO,* 332 Pa. Super. 284, 481 A.2d 616 (1984), and *Gutteridge v. A.P. Green Services Inc.,* 804 A.2d 643 (Pa. Super. 2002), most instructive.

In *Brletich,* Mr. Brletich was working for an independent contractor at a U.S. Steel facility. There were two contracts between U.S. Steel and the contractor for which Brletich worked, both of which provided that the contractor was to be responsible for the proper performance of the work and for insuring the safety of anyone who might enter upon the premises during the course of the project, including the contractor's employees. The contracts allowed for inspections by U.S. Steel's engineer, but specifically did not relieve the contractor of its responsibility to properly perform the work.

Brletich was injured when a crane operator, who also worked for the contractor, jerked one of the beams he was lifting, causing the beam to smash into a trestle rail which, in turn, fell on Brletich, causing severe injuries,

---

3. It should be noted that sections 416 and 427 have been adopted by the Supreme Court of Pennsylvania. *PECO v. James Julian Inc.,* 425 Pa. 217, 228 A.2d 669 (1967). Employees of independent contractors are among the third parties protected by sections 416 and 427. See *e.g., Hargrove v. Frommeyer & Co.,* 229 Pa. Super. 298, 323 A.2d 300 (1974).

including the loss of a leg. The trial court entered a non-suit in favor of U.S. Steel. After examining the duty of a property owner to an independent contractor and the impact of Restatement sections 416 and 427, the appellate court affirmed the nonsuit. The court, in discussing the Restatement sections, found that:

"Comment c of section 413 may be of interest here because it deals with demolition of buildings, tearing down of walls, excavations and other types of work for which an independent contractor is normally employed and which are likely to create 'a dangerous condition unless special precautions are taken to prevent the dangerous condition from existing or to make it harmless after it is created.' That comment further provides: 'The rule stated in this section requires one who entrusts such work to an independent contractor to provide for the taking of necessary precautions to protect others from the danger which in their absence the work necessarily involves. This he can do by providing for the taking of necessary precautions in the contract under which the work is done by a carefully chosen contractor . . . .' " *Brletich, supra* at 533-34, 285 A.2d at 137 (quoting Restatement (Second) of Torts §413, cmt. c).

The court went on to define a competent and careful contractor as one who "possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." *Id.* at 534 n.4, 285 A.2d at 137 n.4 (quoting Restatement (Second) of Torts §411, cmt. a). The court ultimately held that section 413, which defines the "pe-

culiar risk" contemplated in section 416, "has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor; and if the employer has exercised reasonable care to employ a contractor who is competent and careful . . . he is not required to provide, in the contract or otherwise, that the contractor shall take them." *Id.* at 533, 285 A.2d at 136-37.

In *Colloi,* Mr. Colloi was working for a plumbing subcontractor at a PECO facility. Under a running contract with PECO, the contractor was called in to repair an underground leak in the water sprinkler system at a PECO facility. The contractor hired the subcontractor to perform the excavation and plumbing repair. The subcontractor sent a foreman and a laborer, Colloi, to the PECO site, where they were met by a PECO employee and the vice president of the contractor. After reviewing blueprints of the substation waterlines with the contractor's representative and the subcontractor foreman, the PECO employee pointed out the location of the leak to them, and the contractor's representative chose the spot in front of the building for the excavation.

Colloi began breaking up the sidewalk with a jackhammer at the site chosen by the contractor representative. Both the contractor's representative and the PECO employee left the site, but returned repeatedly to follow Colloi's progress. After excavating about five feet, Colloi found that the water pipe was partly "saddled" in con-

crete. The foreman instructed Colloi to break up the concrete so that they could more easily access the broken pipe. As Colloi broke through the concrete with the jackhammer, he struck a 13,200-volt electrical conduit, causing him severe injuries, including second- and third-degree burns over one-third of his body. Based on the contract between PECO and the contractor, the trial court entered a directed verdict in favor of PECO. The appellate court reversed.

After citing the rule as laid out in *Brletich, supra,* the court went on to summarize the relevant case law:

"A landowner owes a duty to warn an unknowing independent contractor of existing dangerous conditions on the landowner's premises where such conditions are known or discoverable to the owner. . . . Such a duty to warn is owed irrespective of whether the independent contractor exercises full control over the work and premises entrusted to him. . . . However, '[a]n owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty to the employees of the independent contractor *with respect to an obviously dangerous condition on that portion of the land in the possession of the contractor.'* . . . It has also been said that the employer of an independent contractor has no duty to warn the contractor or his employees of a condition that is at least as obvious to them as it is to him. . . . In addition, the owner of property is under no duty to protect the employees of an independent contractor from risks arising from or intimately connected with defects or hazards which the contractor has undertaken to repair or which are created by the job contracted. . . .

"In sum, whether the owner of premises owes to his independent contractor a duty to warn of dangerous con-

ditions on the premises can be said to turn on whether the owner, at the time he enters the contract, possesses 'superior knowledge,' . . . or information which places him in a superior position to appreciate the risk posed to the contractor or his employees by the dangerous conditions." *Colloi, supra* at 291-92, 481 A.2d at 619-20. (internal citations omitted) (emphasis in original)

The appellate court found that it was undisputed that PECO took no steps whatsoever to warn the contractor, the subcontractor, or any of their employees, that a 13,200-volt line existed in close proximity to the broken water pipe. The court focused on the testimony of the foreman who testified that he had never seen utility lines running so close together and that he had assumed the concrete block was merely holding the water line in place. The court further focused on testimony that the PECO employee, who had provided and examined the blueprints with the contractor and the subcontractor, and who had been on-site intermittently throughout the excavation, including immediately before Colloi began breaking up the concrete "saddle," failed to give any warning that the concrete contained a power line. Based on this testimony, the appellate court held that whether PECO owed a duty to Colloi was a question for the jury.

The court also examined the applicability of Restatement sections 416 and 427, holding that the above facts and testimony were enough to make out a prime facie case against PECO.

"We think it unarguable that PECO employed an independent contractor 'to do work which the employer should have recognized as likely to create during its progress *a peculiar risk of physical harm to others unless special precautions were taken'. . . and to do 'work*

*involving a special danger to others which the employer knew or had reason to know to be inherent in or normal to the work, or which he contemplated or had reason to contemplate when making the contract.' . . .* We also note that there was ample evidence that either or both of the independent contractors employed in this case . . . failed to take special or reasonable precautions which would seem to have been required by the work they were engaged in. The contractors' agents were fully aware that they were excavating beneath an electrical substation, yet neither took any steps to ascertain whether there were power lines in the area to be excavated. The elements of a case under sections 416 and 427 of the Restatement were thus made out." *Id.* at 297, 481 A.2d at 622-23. (internal citations omitted) (emphasis in original)

In *Gutteridge,* Mr. Gutteridge was the employee of a contractor that performed work at several locations, including a facility owned by PECO. Gutteridge claimed that, as result of the work he was hired to perform, he was exposed to asbestos dust and consequently contracted mesothelioma. His claim against PECO included a property owner liability claim. The progress of this case is complicated by a number of bankruptcy filings and cross claims; however, the end result is that the trial court found against Gutteridge and in favor of all of the defendants, either granting summary judgment or listing them as "settled after assignment for trial." Gutteridge appealed, as did several of the defendants, including PECO.

After determining that Gutteridge was a business invitee and discussing the applicable case law, the court briefly defined the peculiar risk doctrine set out in Restatement sections 416 and 427.

"A peculiar risk (or 'special danger') exists when: (1) a risk is foreseeable to the employer of an independent contractor at the time the contract is executed (that is, if a reasonable person in the position of the employer would foresee the risk and recognize the need to take special measures); and (2) the risk is different from the usual and ordinary risk associated with the general type of work done (that is, the specific project or task chosen by the employer involves circumstances that are substantially out-of-the-ordinary)." *Gutteridge, supra* at 656-57 (citing *Ortiz v. Ra-El Development Corp.,* 365 Pa. Super. 48, 528 A.2d 1355 (1987)).

Then, heavily citing *Colloi's* summary of the law, the court posed two questions central to its analysis: "(1) did PECO possess superior knowledge concerning the existence of asbestos contamination in Mr. Gutteridge's workplace? and (2) was PECO in a better position than Mr. Gutteridge and his employer to appreciate the danger posed by the asbestos contamination?" *Id.* at 658. After examining the record, which included information that PECO was well aware of the dangers of asbestos dust yet failed to warn Gutteridge or his employer, the court found that Gutteridge had shown there was a material dispute as to whether PECO, as a landowner, violated its duty to Gutteridge as a business invitee because it possessed superior knowledge concerning an unseen hazard.

Given these precedents and the record, it is clear that Coolspring, in its capacity as a landowner, did not owe a duty to the plaintiff. The relevant facts are undisputed. The plaintiff was the employee of an independent contractor, Krumanacker Electric, which was hired by Coolspring to perform electrical work at the Jumonville

Road facility. Krumanacker Electric has been the sole electrical contractor at this facility since 1990. Coolspring does not perform any of its own electrical work and, in fact, does not even have an electrician on staff. Dwayne Krumanacker, the plaintiff's supervisor and the other Krumanacker Electric employee who was injured in the explosion, is a trained electrician with over 20 years of electrical experience at the time of the incident and skills equivalent to a journeyman electrician based on union standards. The plaintiff, at the time of the incident, was not an electrician; however, he had had some on-the-job training and specifically admitted that Mr. Krumanacker had warned him about the dangers of working with electricity. Dep. of Lieberger, 11/14/01 at 12. Both Mr. Krumanacker and the plaintiff knew that the wires in the wiring trough were hot when they began working in the trough. *Id.* at 25; dep. of Krumanacker, 11/14/01 at 21, 28. The only way to turn off the power to the wiring trough at the time was to call Allegheny Power and ask them to shut off the power at the outside pole. *Id.* at 21-22, 24. Mr. Krumanacker had authority to call Allegheny Power and request that they turn off the power at the outside pole and had, in fact, done so in the past. *Id.* at 22-24. Mr. Krumanacker did not call Allegheny Power to turn off the power at the outside pole on the day of the incident. *Id.* at 21-22. Coolspring did not know that Mr. Krumanacker and the plaintiff were working on hot wires. Dep. of Mazurak, 5/15/02 at 36-37.

Under the precedents, Coolspring had a duty to warn Krumanacker Electric and its employees, including the plaintiff, of a foreseeable risk that is different from the usual and ordinary risk associated with the job for which Krumanacker Electric was hired. "In order for the liabil-

ity concepts involving contractors to retain any meaning, especially in industries such as construction where almost every job task involves the potential for injury unless ordinary care is exercised, peculiar risk situations should be viewed narrowly, as any other exception to a general rule should be viewed." *Ortiz, supra* at 55-56, 528 A.2d at 1359 (citing *Marshall v. SEPTA,* 587 F. Supp. 258 (E.D. Pa. 1984)). Based on the record, Krumanacker Electric and its employees had sufficient knowledge, skill, and experience to perform the work which it was employed to do without creating unreasonable risk of injury to others and, therefore, Coolspring exercised due care in its selection of a contractor. Additionally, the dangers of working with hot wires are commonly known not only throughout the electrical contracting community but throughout the lay community as well. Thus, the danger does not rise to the level of a peculiar risk or special danger such that a duty was imposed upon Coolspring, requiring it to warn Krumanacker Electric and its employees. Having found that reasonable minds could not differ that Coolspring had no duty to the plaintiff, Coolspring, as a matter of law, cannot be found liable to the plaintiff under his theory of property owner liability.

Under the plaintiff's second theory of negligence, negligence per se, the plaintiff argues that Coolspring owed him a duty under the federal Mine Safety and Health Act and its regulations. The specific regulations cited by the plaintiff are 30 C.F.R. §§57.12016 and 57.12017. These regulations state:

"Section 57.12016 Work on electrically-powered equipment

"Electrically-powered equipment shall be de-energized before mechanical work is done on such equipment.

Power switches shall be locked out or other measures taken which shall prevent the equipment from being energized without the knowledge of the individuals working on it. Suitable warning notices shall be posted at the power switch and signed by the individuals who are to do the work. Such locks or preventative devices shall be removed only by the persons who installed them or by authorized personnel.

"Section 57.12017 Work on power circuits

"Power circuits shall be de-energized before work is done on such circuits unless hot-line tools are used. Suitable warning signs shall be posted by the individuals who are to do the work. Switches shall be locked out or other measures taken which shall prevent the power circuits from being energized without the knowledge of the individuals working on them. Such locks, signs, or preventative devices shall be removed only by the person who installed them or by authorized personnel." 30 C.F.R. §§57.12016, 57.12017.

Negligence per se is a subset of the basic negligence tort, and is based on the theory that the violation of a statute may serve as the basis for a finding of negligence. This theory recognizes that, "through an individual's violation of a statute, . . . it is possible to show that the individual breached his duty to behave as a reasonable person: in other words, that the individual is 'negligent per se.'" *McCloud v. McLaughlin,* 837 A.2d 541, 545 (Pa. Super. 2003). This theory establishes both duty and breach of duty where the defendant has violated an applicable statute designed to prevent a public harm. *Minnich v. Yost,* 817 A.2d 538, 541 (Pa. Super. 2003) (citing *Campo v. St. Luke's Hospital,* 755 A.2d 20 (Pa. Super. 2000)). The purpose of the statute must be to pro-

tect the interests of a group of individuals, as opposed to the general public, and the statute must clearly apply to the conduct of the defendant. *Minnich, supra* (citing *J.E.J. v. Tri-County Big Brothers/Big Sisters,* 692 A.2d 582 (Pa. Super. 1997)). Accordingly, the courts have narrowly interpreted what type of person falls within the ambit of a statute designed to protect the public at large and the requirement that the harm suffered be that which the statute was designed to protect. *Minnich, supra* (citing *Campo, supra*).

Coolspring, which is under the jurisdiction of the federal Mine Safety and Health Administration, reported the explosion to MSHA within hours of the explosion.[4] MSHA investigated the explosion and issued a citation to Coolspring prohibiting any activity in the affected mine until remedial actions had been taken.

Given that MSHA issued a citation to Coolspring, it is clear that Coolspring was in violation of at least one MSHA regulation, though the citation does not address which regulation was violated. As both the plaintiff and Coolspring have cited sections 57.12016 and 57.12017, we will address only these sections.[5] Taking the facts and averments in the light most favorable to the plaintiff

---

4. It should be noted that there is some dispute over the exact time the explosion occurred; however, the testimony is uncontroverted that it happened "after lunch." Thus MSHA was notified sometime in mid-afternoon, and the investigator had arrived and issued the citation by 7:09 that evening.

5. But see, 30 C.F.R. §45.1, suggesting that independent contractors at mines are responsible for violations committed by them or their employees. As this regulation has not been addressed by either counsel, and as we do not have sufficient facts on the record to make a determination of its applicability, we will not discuss whether, or how, it impacts Coolspring's liability under sections 57.12016 and 57.12017.

as the non-moving party, we will assume that the MSHA citation was issued under sections 57.12016 and 57.12017. What is left for us to determine, then, is whether those regulations are meant to protect the general public or a defined group of individuals. The Federal Mine Safety and Health Act, 30 U.S.C.S. §801 et seq., states as its primary purpose the health and safety of the miner. 30 U.S.C.S. §801(a). "Miner" is defined as any individual working in a coal or other mine. 30 U.S.C.S. §802(g). Given the policy as set forth in the Mine Safety and Health Act, we find that the MSHA regulations protect a defined group—people who work at mines—and not the public at large. See also, *e.g., National Independent Coal Operator's Association v. Kleppe,* 423 U.S. 388, 96 S.Ct. 809, 46 L.Ed.2d 580 (1976). The regulations, therefore, may be used to find that Coolspring was negligent per se. Since this is Coolspring's motion, our determination on this issue is limited to whether Coolspring could be found to be not negligent per se as a matter of law. Given that the regulations may be used to determine negligence per se, and given that MSHA issued a citation to Coolspring, it appears that a genuine issue of material fact exists as to whether Coolspring could be found liable for negligence per se. Therefore, Coolspring is not entitled to summary judgment on this issue.

We now turn to co-defendant FCI's cross claim, which demands contribution from Coolspring. Coolspring argues that it cannot be ordered to pay contribution to co-defendant in any amount because the plaintiff's allegations against Coolspring are based on negligence and negligence per se, whereas the plaintiff's allegations against FCI are based on strict products liability. While

we agree that Coolspring's argument may be correct under the Commonwealth's Comparative Negligence Act, 42 Pa.C.S. §7102 et seq., Coolspring fails to escape responsibility under the Uniform Contribution Among Joint Tort-Feasors Act, 42 Pa.C.S. §8321.

As to the Comparative Negligence Act, *supra,* our Superior Court thoroughly reviewed the applicable precedents and determined that "it was never the intention of our legislature to extend the scope of [the Comparative Negligence Act] to any actions except those grounded in negligence." *McMeekin v. Harry M. Stevens Inc.,* 365 Pa. Super. 580, 583, 530 A.2d 462, 464 (1987). Given the holding in *McMeekin,* Coolspring is correct that, assuming it is found negligent, it cannot be ordered to pay contribution to FCI under the Comparative Negligence Act.

The Comparative Negligence Act, however, is not the only statute under which Coolspring can be found responsible for contribution. Pennsylvania has also enacted the Uniform Contribution Among Joint Tort-Feasors Act, 42 Pa.C.S. §8321 et seq. This Act states:

"Section 8322. Definition

"As used in this subchapter, 'joint tort-feasors' means two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them.

"Section 8324. Right of contribution

"(a) General rule.—The right of contribution exists among joint tort-feasors.

"(b) Payment required.—A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or had paid

more than his pro rata share thereof." 42 Pa.C.S. §§8322, 8324.

As to this Act, the Superior Court has repeatedly held that "the Uniform Act may properly be applied so that joint tort-feasors may obtain contribution from each other, despite the fact that the one joint tort-feasor has been found liable in negligence and the other in strict products liability." *McMeekin, supra* at 585, 530 A.2d at 465. (footnote omitted) See also, *Svetz v. Land Tool Co.,* 355 Pa. Super. 230, 513 A.2d 403 (1986) (holding that, where strictly liable and negligent defendants have acted as joint tort-feasors, contribution among them can be properly awarded); *Moran v. G. & W.H. Corson Inc.,* 402 Pa. Super. 101, 586 A.2d 416 (1991) (holding that the Uniform Contribution Among Tort-Feasors Act may properly be applied to effectuate contribution among joint tort-feasors where one tort-feasor is adjudged liable of negligence and the other liable under the concepts of strict products liability); and *Smith v. Weissenfels Inc.,* 441 Pa. Super. 328, 657 A.2d 949 (1995) (holding that the Uniform Act may properly be applied so that joint tort-feasors may obtain contribution from each other despite the fact that the one joint tort-feasor has been found liable in negligence and the other in strict products liability).

The court, in a lengthy discussion of the legislative intent and the policies underlying its ruling, found that, unlike the Comparative Negligence Act, the "focus of the Uniform Act is on the relationship existing between tort-feasors rather than the manner in which several tort-feasors have been held liable to an injured claimant." *McMeekin, supra* at 586, 520 A.2d at 465 (quoting *Svetz, supra* at 238, 513 A.2d at 407). It also found that "contribution is not a recovery for the tort committed against

the plaintiff, but the enforcement of an equitable duty to share liability for the wrong done." *Id.* (citing *Puller v. Puller,* 380 Pa. 219, 221, 110 A.2d 175, 177 (1955)). Under this theory, "a tort-feasor's right to receive contribution from a joint tort-feasor derives, not from his liability to the claimant, but rather from the equitable principle that once the joint liability of several tort-feasors has been determined, it would be unfair to impose the financial burden of the plaintiff's loss on one tort-feasor to the exclusion of the other. It matters not in which theory a tort-feasor has been held responsible for the tort committed against the plaintiff. So long as the party seeking contribution has paid in excess of his or her share of liability, it would be inequitable under the [Uniform] Act to deny that party's right to contribution from a second tort-feasor who also contributed to the plaintiff's injury." *Id.*

Based on the statutory definition of joint tort-feasors, the Superior Court further found that the "statutory language does not limit the right of contribution to tort-feasors who have been guilty of negligence. Contribution is available whenever two or more persons are jointly or severally liable in tort, irrespective of the theory by which that liability is imposed." *McMeekin, supra* at 587, 530 A.2d at 465 (citing *Svetz, supra* at 238, 513 A.2d at 407-408).

Specifically addressing the relationship between strictly liable tort-feasors and negligent tort-feasors, the Superior Court opined that allowing a strictly liable tort-feasor to recover from a negligent joint tort-feasor merely effectuates the Uniform Act's goal of achieving equity between tort-feasors without undermining the policy of strict liability. *Id.*

"Strict liability was intended to benefit injured consumers. It was designed to enhance the consumer-plaintiff's chances of recovery by eliminating the burden of proving the manufacturer's negligence. Strict liability was based upon a policy determination that, as between an innocent consumer and a manufacturer of a defective product, the manufacturer should bear the loss. The focus of strict liability, therefore, must be upon the relationship existing between the plaintiff-consumer and the defendant-manufacturer. . . .

"The focus of the Uniform Contribution Among Tort-Feasors Act, on the other hand, is upon the relationship between tort-feasors after a determination has been made that they are jointly liable for the plaintiff's injury. Thus, it is only after plaintiff's loss has been assessed against joint tort-feasors and the policy goals of strict liability have been satisfied that the Act achieves significance. It then seeks to achieve an equitable apportionment of that loss among all tort-feasors who have contributed to the loss." *Id.* at 587-88, 530 A.2d at 466.

Based upon the Superior Court's analysis and holding, it is clear that, if both Coolspring and FCI are found to be liable to the plaintiff, then each of FCI and Coolspring is liable to the other for contribution under the Uniform Contribution Among Tort-Feasors Act.

Hence, upon the foregoing, and taking all facts in the light most favorable to the non-moving parties, we determine that Coolspring is entitled to summary judgment on the plaintiff's claim of negligence, but that there exist genuine questions of material fact as to the plaintiff's claim of negligence per se and as to co-defendant FCI's demand for contribution. Wherefore, we will enter the following order.

## ORDER

And now, May 11, 2005, upon the record in this case, it is hereby ordered and decreed that the motion of the defendant Coolspring Stone Supply Inc. for summary judgment is granted with respect to the plaintiff's claim of negligence.

It is hereby further ordered and decreed that the motion of the defendant Coolspring Stone Supply Inc., for summary judgment is denied with respect to the plaintiff's claim of negligence per se.

It is hereby still further ordered and decreed that the motion of the defendant Coolspring Stone Supply Inc. for summary judgment is denied with respect to the cross claim of co-defendant FCI Inc. for contribution.